UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MANASA THIMMEGOWDA, individually and on behalf of all others similarly situated,

Plaintiff,

v.

BIG FISH GAMES, INC., a Washington corporation; ARISTOCRAT TECHNOLOGIES INC., a Nevada corporation; ARISTOCRAT LEISURE LIMITED, an Australian corporation; and CHURCHILL DOWNS INCORPORATED, a Kentucky corporation,

Defendants.

NO.

**CLASS ACTION COMPLAINT**

**JURY DEMAND**

Plaintiff Manasa Thimmegowda brings this case, individually and on behalf of all others similarly situated, against Defendants, Big Fish Games, Inc. ("Big Fish"), Aristocrat Technologies Inc. and Aristocrat Leisure Limited ("Aristocrat"), and Churchill Downs Incorporated ("Churchill Downs") (collectively, "Defendants") to enjoin and obtain redress for Defendants' operation of illegal online casino games. Plaintiff alleges as follows:

## I.  NATURE OF THE ACTION

1. Defendants are the current owners and operators of "Big Fish Casino" as well as other similar internet casino games that compete in the so-called "social casino" market.

CLASS ACTION COMPLAINT - 1

2.      The Ninth Circuit recently held that Big Fish Casino "constitutes illegal gambling under Washington law." *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785 (9th Cir. 2018).

3.      Insofar as the *Kater* case seeks relief from Big Fish Casino's *prior* owner and operator, on behalf of individuals who began playing Big Fish Casino before a certain date, this case—which additionally seeks redress from the *current* ownership and operation, and does so on behalf of individuals that began playing Big Fish Casino and other similar games after that certain date—is essentially a companion case that fills in any gaps left by *Kater*.

4.      Through "Big Fish Casino" and other similar internet casinos, Defendants offer a multitude of electronic slot machine and other internet casino games to consumers. Consumers play Big Fish Casino and Defendants' other casino games on Apple iOS devices, Android Devices, and Facebook.

5.      Defendants provide a bundle of free "chips" to first-time visitors of their online casinos that can be used to wager on their games. After consumers inevitably lose their initial allotment of chips, Defendants attempt to sell them additional chips. Without additional chips, consumers cannot play Defendants' gambling games.

6.      Freshly topped off with additional chips, consumers wager to win more chips. The chips won by consumers playing Defendants' games of chance are identical to the chips that it sells. Thus, by wagering chips that consumers purchase, consumers have the chance to win additional chips that they would otherwise have to purchase.

7.      By operating Big Fish Casino and other similar online gambling games, Defendants have violated Washington law and illegally profited from tens of thousands of consumers. Accordingly, Plaintiff, on behalf of herself and a Class of similarly situated

CLASS ACTION COMPLAINT - 2

1    individuals, brings this lawsuit to recover her losses and to obtain other appropriate relief.

2    ## II.  PARTIES

3        8.      Plaintiff Manasa Thimmegowda is a natural person who is domiciled in the state

4    of Florida.

5        9.      Defendant Big Fish Games, Inc., is a corporation organized and existing under

6    the laws of Washington, with its principal place of business at 906 Alaskan Way, Suite 700,

7    Seattle Washington 98104. Big Fish Games, Inc. conducts business throughout this District,

8    Washington State, and the United States.

9        10.     Defendant Aristocrat Technologies, Inc., is a corporation organized and existing

10   under the laws of Nevada, with its principal place of business at 7230 Amigo Street Las Vegas,

11   NV 89119 United States. Aristocrat Technologies, Inc. conducts business throughout this

12   District, Washington State, and the United States.

13       11.     Defendant Aristocrat Leisure Limited is a corporation organized and existing

14   under the laws of Australia, with its principal place of business at Building A, Pinnacle Office

15   Park, 85 Epping Road, North Ryde NSW 3113, Australia. Aristocrat conducts business

16   throughout this District, Washington State, and the United States.

17       12.     Defendant Churchill Downs Incorporated is a corporation incorporated under

18   the laws of the state of Kentucky with a principal place of business at 600 N. Hurstbourne

19   Parkway Suite 400 Louisville, KY 40222. Churchill Downs has conducted business throughout

20   this District, Washington State, and the United States.

21   ## III.  JURISDICTION AND VENUE

22

23       13.     Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because

     (a) at least one member of the Class is a citizen of a state different from Defendants, (b) the

CLASS ACTION COMPLAINT - 3

**Tousley Brain Stephens PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

14.     The Court has personal jurisdiction over Defendants because Defendants conduct significant business transactions in this District, and because the wrongful conduct occurred in and emanated from this District.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## IV.  FACTUAL ALLEGATIONS

### A.     Free-to-Play and the New Era of Online Gambling

16.     The proliferation of internet-connected mobile devices has led to the growth of what are known in the industry as "free-to-play" videogames. The term is a misnomer. It refers to a model by which the initial download of the game is free, but companies reap huge profits by selling thousands of "in-app" items that start at $0.99 but can quickly escalate to hundreds or even thousands of dollars.

17.     The in-app purchase model has become particularly attractive to developers of games of chance (*e.g.*, poker, blackjack, and slot machine mobile videogames, amongst others), because it allows them to generate huge profits. In 2017, free-to-play games of chance generated over $3.8 billion in worldwide revenue, and they are expected to grow by ten percent annually.[1] Even "large land-based casino operators are looking at this new space" for "a healthy growth potential."[2]

---

[1]     GGRAsia – Social casino games 2017 revenue to rise 7pct plus says report, http://www.ggrasia.com/social-casino-games-2017-revenue-to-rise-7pct-plus-says-report/ (last visited February 11, 2019)

[2]     *Report confirms that social casino games have hit the jackpot with $1.6B in revenue | GamesBeat,* https://venturebeat.com/2012/09/11/report-confirms-that-social-casino-games-have-hit-the-jackpot-with-1-6b-in-revenue/ (last visited February 11, 2019)

CLASS ACTION COMPLAINT - 4

18.     With games of chance that employ the in-game purchase strategy, developers have begun exploiting the same psychological triggers as casino operators. As one respected videogame publication put it:

> "If you hand someone a closed box full of promised goodies, many will happily pay you for the crowbar to crack it open. The tremendous power of small random packs of goodies has long been known to the creators of physical collectible card games and companies that made football stickers a decade ago. For some … the allure of a closed box full of goodies is too powerful to resist. Whatever the worth of the randomised [sic] prizes inside, the offer of a free chest and the option to buy a key will make a small fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item."[3]

19.     Another stated:

> "Games may influence 'feelings of pleasure and reward,' but this is an addiction to the games themselves; micro-transactions play to a different kind of addiction that has existed long before video games existed, more specifically, an addiction similar to that which you could develop in casinos and betting shops."[4]

20.     The comparison to casinos doesn't end there. Just as with casino operators, mobile game developers rely on a small portion of their players to provide the majority of their profits. These "whales," as they're known in casino parlance, account for just "0.15% of players" but provide "over 50% of mobile game revenue."[5]

21.     Game Informer, another respected videogame magazine, reported on the rise (and danger) of micro-transactions in mobile games and concluded:

> "[M]any new mobile and social titles target small, susceptible populations for large percentages of their revenue. If ninety-five people all play a [free-to-play] game without spending money, but five people each pour $100 or more in to obtain virtual currency, the designer can break even. These five individuals are what the industry calls whales, and we tend not to be too concerned with how

---

[3]     PC Gamer, *Microtransactions: the good, the bad and the ugly*, http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Feb. 11, 2019).
[4]     The Badger, *Are micro-transactions ruining video games? | The Badger*, http://thebadgeronline.com/2014/11/micro-transactions-ruining-video-games/ (last visited Feb. 11, 2019).
[5]     *Id.* (emphasis added).

CLASS ACTION COMPLAINT - 5

1   they're being used in the equation. While the scale and potential financial ruin is
2   of a different magnitude, a similar profitability model governs casino
    gambling."[6]

3       22.     Academics have also studied the socioeconomic effect games that rely on in-app

4   purchases have on consumers. In one study, the authors compiled several sources analyzing so-

5   called free-to-play games of chance (called "casino" games below) and stated that:

6       "[Researchers] found that [free-to-play] casino gamers share many similar
        sociodemographic characteristics (*e.g.*, employment, education, income) with
7       online gamblers. Given these similarities, it is perhaps not surprising that a strong
        predictor of online gambling is engagement in [free-to-play] casino games.
8       Putting a dark line under these findings, over half (58.3%) of disordered gamblers
        who were seeking treatment stated that social casino games were their first
9       experiences with gambling."

10      …

11      "According to [another study], the purchase of virtual credits or virtual items
        makes the activity of [free-to-play] casino gaming more similar to gambling.
12      Thus, micro-transactions may be a crucial predictor in the migration to online
        gambling, as these players have now crossed a line by paying to engage in these
13      activities. Although, [sic] only 1–5% of [free-to-play] casino gamers make
        micro-transactions, those who purchase virtual credits spend an average of $78.
14      Despite the limited numbers of social casino gamers purchasing virtual credits,
        revenues from micro-transactions account for 60 % of all [free-to-play] casino
15      gaming revenue. Thus, a significant amount of revenue is based on players'
        desire to purchase virtual credits above and beyond what is provided to the
16      player in seed credits."[7]

17      23.     The same authors looked at the link between playing free-to-play games of

18  chance and gambling in casinos. They stated that "prior research indicated that winning large

19  sums of virtual credits on social casino gaming sites was a key reason for [consumers']

20  ―――――――――――――――――――
21  [6]     Game Informer, *How Microtransactions Are Bad For Gaming - Features - www.GameInformer.com*,
    http://www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-are-bad-for-
    gaming.aspx?CommentPosted=true&PageIndex=3 (last visited February 11, 2019)
22  [7]     Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An
    Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the
    National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov.
23  14, 2014), *available at* http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (citations
    omitted).

CLASS ACTION COMPLAINT - 6

migration to online gambling," yet the largest predictor that a consumer will transition to online gambling was "micro-transaction engagement." In fact, "the odds of migration to online gambling were approximately *eight times greater* among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."[8]

24.     The similarity between micro-transaction based games of chance and games of chance found in casinos has caused governments across the world to intervene to limit their availability.[9] Unfortunately, such games have eluded regulation in the United States. As a result, and as described below, Defendants' online gambling games have thrived and thousands of consumers have spent millions of dollars unwittingly playing Defendants' unlawful games of chance.

**B.     A Brief Introduction to Big Fish and Aristocrat**

25.     Big Fish is a developer of slot machine-based "Social Casino" games. Its marquee product is Big Fish Casino. On information and belief, Big Fish Casino drives annual revenues in excess of $100 million, and Big Fish's overall "social casino" portfolio drives annual revenues in excess of $200 million.

26.     Big Fish and its founders have reaped substantial profits through a series of mergers and acquisitions by some of the largest gambling companies in the world.

27.     For example, in 2014, Churchill Downs, Inc.—of Kentucky Derby fame—

---

[8]     *Id.* (emphasis added).

[9]     In late August 2014, South Korea began regulating "social gambling" games, including games similar to Defendants', by "ban[ning] all financial transactions directed" to the games. PokerNews.com, *Korea Shuts Down All Facebook Games In Attempt To Regulate Social Gambling | PokerNews*, https://www.pokernews.com/news/2014/09/korea-shuts-down-facebook-games-19204.htm (last visited Feb. 11, 2019). Similarly, "the Maltese Lotteries and Gambling Authority (LGA) invited the national Parliament to regulate all digital games with prizes by the end of 2014." *Id.*

CLASS ACTION COMPLAINT - 7

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

purchased Big Fish for approximately $885 million.[10]

28.     Defendant Aristocrat Leisure is a multinational corporation that primarily manufacture slot machines. It is headquartered in Australia but has employees in 103 different countries.

29.     In 2018, Aristocrat purchased Big Fish from Churchill Downs for approximately $990 million.[11]

**C.     Consumers Do Not Consent To Any Terms Of Service Before Playing Big Fish**

30.     Consumers can play Big Fish Casino and its various slot machines and casino games—as well as Defendants' other social casino games—by downloading Big Fish's app on an Apple iOS device, on an Android device, or by playing the online casino games on Facebook.

**1.     Mobile App Users**

31.     As is—for whatever reason—standard practice in the "Social Casino" industry, consumers who download the Big Fish Casino app and then purchase chips on their mobile devices are neither required to create an account with Big Fish nor asked to agree to or consent to any terms of service before playing Big Fish games.

32.     For example, Apple iOS users navigate to the App Store to download the Big Fish Casino mobile app. They are never presented with terms of any kind before downloading the app. *See* Figure 1.

---

[10]     *Big Fish Games to be acquired for $885 million by racetrack operator Churchill Downs* – GeekWire, http://www.geekwire.com/2014/churchill-downs-acquires-big-fish/ (last visited Feb. 11, 2019).

[11]     *Churchill Downs Incorporated Announces Closing of the Sale of Big Fish Games, Inc. to Aristocrat Technologies, Inc. for US$990 million*, Churchill Downs, Inc., https://globenewswire.com/news-release/2018/01/09/1286371/0/en/Churchill-Downs-Incorporated-Announces-Closing-of-the-Sale-of-Big-Fish-Games-Inc-to-Aristocrat-Technologies-Inc-for-US-990-million.html (last visited Feb. 11, 2019).

CLASS ACTION COMPLAINT - 8

1

(<u>**Figure 1.**</u>)                    (<u>**Figure 2.**</u>)

2

3

4




5

6

7

8

9

10

11

12

13

14

15

16      33.      When a consumer launches the Big Fish mobile app, they are first presented

17   with a loading screen while the player connects to Big Fish's servers. *See* <u>Figure 2.</u>

18   //

19   //

20   //

21   //

22   //

23   //

CLASS ACTION COMPLAINT - 9

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

(<u>**Figure 3.**</u>)                    (<u>**Figure 4.**</u>)




34.     Big Fish first offers consumers an allotment of free chips through one "Daily Spin" and a "Return Bonus," as shown in <u>Figure 3</u>. Then, Big Fish presents consumers with various offers to purchase chips with real money at a discount. (<u>Figures 4</u>-<u>5</u>). As shown in <u>Figure 4 above</u>, Big Fish announces a "Limited Time Offer!" for "95% Off" a 2,200,000 chip package for "only $4.99."

35.     Consumers can either accept Big Fish's offers to purchase discounted chips or they can dismiss these offers and play Big Fish's casino games, as shown in <u>Figure 6.</u>

CLASS ACTION COMPLAINT - 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

(**Figure 5.**)     (**Figure 6.**)




18      36.    Consumers are never asked to consent to Big Fish's terms before playing these

19  games or before paying real money for Defendants' virtual casino chips.

20      **2.    Facebook Users**

21      37.    Consumers can also play Big Fish's casino games via Facebook. Like with Big

22  Fish's mobile version, and consistent with the rest of the "social casino industry," Facebook-

23  based Big Fish Casino players are neither required to create an account with Big Fish to play its

CLASS ACTION COMPLAINT - 11

various casino games or to purchase chips, nor are they asked to consent to Big Fish's terms.

38.       Consumers first login to their Facebook account and upon searching for and clicking to play Big Fish Casino are redirected to Big Fish's games without ever having been presented with any terms of service. *See* Figures 7-8.



(**Figure 7**, partially redacted for privacy)



(**Figure 8**, partially redacted for privacy)

CLASS ACTION COMPLAINT - 12

39.     Once the consumer connects to Big Fish's game servers, Big Fish offers an allotment of free chips through a "Return Bonus" and one "Daily Spin." *See* <u>Figure 9</u>.



(**Figure 9,** partially redacted for privacy)

40.     Finally, the consumer can play Big Fish's casino games by selecting one of its many slot machines. *See* <u>Figure 10.</u>



(**Figure 10,** partially redacted for privacy)

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

41.     Consumers are never asked to consent to Big Fish's terms before playing these games or before paying real money for Defendants' virtual casino chips.

**D.      Defendants' Online Casinos Contains Unlawful Games of Chance**

42.     Consumers visiting Defendants' online casinos for the first time are awarded free chips. These free sample chips offer a taste of gambling and are designed to encourage players to get hooked and buy more chips for real money.

43.     After they begin playing, consumers quickly lose their initial allotment of chips. Immediately thereafter, Big Fish informs them via a "pop up" screen that they have "Insufficient Cash" to place a wager, which prevents them from additional play. *See* Figure 11.



(**Figure 11,** showing Big Fish's mobile application.)

44.     Concurrently with that warning, Big Fish provides a link to consumers, telling them to "GET CHIPS" at the electronic store where the price for chips ranges from prices of $1 to **at least $999.99**. Big Fish's offer to purchase chips with real money is substantially the same on its mobile app and on Facebook. Once players run out of their allotment of free chips, they cannot continue to play the game without buying more chips for real money.

CLASS ACTION COMPLAINT - 14

45.     Even during the check-out process when consumers purchase chips with real money, Big Fish does not show consumers its Terms. *See* <u>Figures 12-13.</u>



(**<u>Figure 12,</u>** the chip purchase page on iOS, partially redacted for privacy.)



CLASS ACTION COMPLAINT - 15

1

2          (**Figure 13,** showing the chip purchase page on Facebook.)

3          46.     When purchasing chips via Facebook, the consumer is presented with a link

4    only to Facebook's terms, in Facebook's capacity as the transaction processor. The consumer is

5    not presented with terms for Big Fish Casino or Big Fish Games.

6          47.     To begin wagering, players select the "BET" that will be used for a spin, as

7    illustrated in <u>Figure 14</u>, which shows one of Defendants' slot machine games in Big Fish

8    Casino. Big Fish allows players to increase or decrease the amount he or she can wager and

9    ultimately win (or lose).

10
11   
12
13         (**Figure 14.**)

14         48.     Once a consumer spins the slot machine by pressing the "SPIN" button, no

15   action on his or her part is required. Indeed, none of Defendants' online casino games allow (or

16   call for) any additional user action. Instead, the consumer's computer or mobile device

17   communicates with and sends information (such as the "BET" amount) to Big Fish's servers.

18   Big Fish's servers then execute the game's algorithms that determine the spin's outcome.

19         49.     Consumers can continue playing with the chips that they won, or they can exit

20   the game and return at a later time to play because Big Fish maintains win and loss records and

21   balances for each consumer. Indeed, once Big Fish's algorithms determine the outcome of a

22   spin and Big Fish displays the outcome to the consumer, Big Fish adjusts the consumer's

23   balance. Big Fish keeps records of each wager, outcome, win, and loss for every player.

CLASS ACTION COMPLAINT - 16

## V.  FACTS SPECIFIC TO PLAINTIFF

50.     In approximately November 2017, Plaintiff began playing Big Fish Casino on her Apple iOS device. Within three months of playing Big Fish Casino for the first time, Plaintiff began regularly paying real money to purchase virtual chips in Big Fish Casino.

51.     Thereafter, Plaintiff continued playing various slot machines and other games of chance within Defendants' casino where she would wager purchased chips for the chance of winning additional chips.

52.     Between November 2017 and December 2018, Plaintiff wagered and lost (and Defendants therefore won) over $3,000 at Defendants' games of chance.

## VI.  CLASS ALLEGATIONS

53.     **Class Definitions**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of a Class of similarly situated individuals, defined as follows:

> **Class**: All persons in the United States who began playing Big Fish Casino or other similar Big Fish Games "casino games" on or after March 24, 2015, and lost purchased chips by wagering at Defendants' casino games.

The following people are excluded from the Class: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

54.     **Numerosity**: On information and belief, tens of thousands of consumers fall into the definition of the Class. Members of the Class can be identified through Defendants' records, discovery, and other third-party sources.

55.     **Commonality and Predominance**: There are many questions of law and fact common to Plaintiff's and the Class' claims, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a.      Whether Defendants' online casino games are "gambling" as defined by RCW § 9.46.0237;

b.      Whether Defendants are the proprietors for whose benefit the online casino games are played;

c.      Whether Plaintiff and each member of the Class lost money or anything of value by gambling;

d.      Whether Defendants violated the Washington Consumer Protection Act, RCW § 19.86.010, *et seq.*; and

e.      Whether Defendants have been unjustly enriched as a result of its conduct.

56.     **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff's and the members of the Class sustained damages arising out of Defendants' wrongful conduct.

57.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and Class actions. Plaintiff's claims are representative of the claims of the other members of the Class, as Plaintiff and each member of the Class lost money playing

CLASS ACTION COMPLAINT - 18

Defendants' games of chance. Plaintiff also has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to the Class.

58.     **Policies Generally Applicable to the Class**: This Class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies that Plaintiff challenges apply and affect members of the Class uniformly, and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of Defendants' liability to Plaintiff and to the other members of the Class are the same.

59.     **Superiority**: This case is also appropriate for certification because Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendants' wrongful conduct. Absent a Class action, it would be difficult for the individual members of the Class to obtain effective relief from Defendants. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a Class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a Class action presents far fewer management difficulties and provides the benefits of

CLASS ACTION COMPLAINT - 19

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

60.    Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

## VII.  FIRST CAUSE OF ACTION
### Violations of Revised Code of Washington § 4.24.070
### (On behalf of Plaintiff and the Class)

61.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

62.    Plaintiff, members of the Class, and Defendants are all "persons" as defined by RCW § 9.46.0289.

63.    Washington's "Recovery of money lost at gambling" statute, RCW 4.24.070, provides that "all persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost."

64.    "Gambling," defined by RCW § 9.46.0237, "means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence."

65.    Defendants' "chips" sold for use in its online gambling games are "thing[s] of value" under RCW § 9.46.0285.

66.    Defendants' online gambling games are illegal gambling games because they are online games at which players wager things of value (the chips) and by an element of chance

CLASS ACTION COMPLAINT - 20

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

(*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional chips).

67.     Defendants are the proprietors for whose benefit the online gambling games are played because they own the online gambling games and operate those games for their own profit.

68.     Plaintiff and the Class gambled when they purchased chips to wager at Defendants' online gambling games. Plaintiff and each member of the Class staked money, in the form of chips purchased with money, at Defendants' games of chance (*e.g.*, Defendants' slot machines) for the chance of winning additional things of value (*e.g.*, chips that extend gameplay without additional charge).

69.     In addition, Defendants' online gambling games are not "pinball machine[s] or similar mechanical amusement device[s]" as contemplated by the statute because:

    a.     the games are electronic rather than mechanical;

    b.     the games confer replays but they are recorded and can be redeemed on separate occasions (*i.e.*, they are not "immediate and unrecorded"); and

    c.     the games contain electronic mechanisms that vary the chance of winning free games or the number of free games which may be won (*e.g.*, the games allow for different wager amounts).

70.     RCW § 9.46.0285 states that a "'Thing of value,' as used in this chapter, means any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge."

CLASS ACTION COMPLAINT - 21

71.     The "chips" Plaintiff and members of the Class had the chance of winning in Defendants' online gambling games are "thing[s] of value" under Washington law because they are credits that involve the extension of entertainment and a privilege of playing a game without charge.

72.     Defendants' online gambling games are "Contest[s] of chance," as defined by RCW § 9.46.0225, because they are "contest[s], game[s], gaming scheme[s], or gaming device[s] in which the outcome[s] depend[] in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." Defendants' online gambling games are programmed to have outcomes that are determined entirely upon chance and a contestant's skill does not affect the outcomes.

73.     RCW § 9.46.0201 defines "Amusement game[s]" as games where "The outcome depends in a material degree upon the skill of the contestant," amongst other requirements. Defendants' online gambling games are not "Amusement game[s]" because their outcomes are dependent entirely upon chance and not upon the skill of the player and because the games are "contest[s] of chance," as defined by RCW § 9.46.0225.

74.     As a direct and proximate result of Defendants' gambling game, Plaintiff and each member of the Class have lost money wagering at Defendants' games of chance. Plaintiff, on behalf of herself and the Class, seeks an order (1) requiring Defendants to cease the operation of its gambling games; and/or (2) awarding the recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

CLASS ACTION COMPLAINT - 22

## VIII.  SECOND CAUSE OF ACTION
### Violations of the Washington Consumer Protection Act, RCW § 19.86.010, *et seq.*
### (On behalf of Plaintiff and the Class)

75.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

76.     Washington's Consumer Protection Act, RCW § 19.86.010 *et seq.* ("CPA"), protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

77.     To achieve that goal, the CPA prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." RCW § 19.86.020.

78.     The CPA states that "a claimant may establish that the act or practice is injurious to the public interest because it . . . Violates a statute that contains a specific legislative declaration of public interest impact."

79.     Defendants violated RCW § 9.46.010, *et seq.* which declares that:

> "The public policy of the state of Washington on gambling is to keep the criminal element out of gambling and to promote the social welfare of the people by limiting the nature and scope of gambling activities and by strict regulation and control.
>
> It is hereby declared to be the policy of the legislature, recognizing the close relationship between professional gambling and organized crime, to restrain all persons from seeking profit from professional gambling activities in this state; to restrain all persons from patronizing such professional gambling activities; to safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling; and at the same time, both to preserve the freedom of the press and to avoid restricting participation by individuals in activities and social pastimes, which activities and social pastimes are more for amusement rather than for profit, do not maliciously affect the public, and do not breach the peace."

80.     Defendants have violated RCW § 9.46.010, *et seq.*, because its Defendants' online games are illegal online gambling games.

CLASS ACTION COMPLAINT - 23

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

81.     Defendants' wrongful conduct occurred in the conduct of trade or commerce—*i.e.*, while Defendants were engaged in the operation of making computer games available to the public.

82.     Defendants' acts and practices were and are injurious to the public interest because Defendants, in the course of their business, continuously advertised to and solicited the general public in Washington State and throughout the United States to play their unlawful online gambling games of chance. This was part of a pattern or generalized course of conduct on the part of Defendants, and many consumers have been adversely affected by Defendants' conduct and the public is at risk.

83.     Defendants have profited immensely from their operation of unlawful games of chance, amassing hundreds of millions of dollars from the losers of their games of chance.

84.     As a result of Defendants' conduct, Plaintiff and the Class members were injured in their business or property—*i.e.*, economic injury—in that they lost money wagering on Defendants' unlawful games of chance.

85.     Defendants' unfair or deceptive conduct proximately caused Plaintiff's and the Class members' injuries because, but for the challenged conduct, Plaintiff and the Class members would not have lost money wagering at or on Defendants' games of chance, and they did so as a direct, foreseeable, and planned consequence of that conduct.

86.     Plaintiff, on her own behalf and on behalf of the Class, seeks to enjoin further violation and recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

## IX.  THIRD CAUSE OF ACTION
### Unjust Enrichment
### (On behalf of Plaintiff and the Class)

CLASS ACTION COMPLAINT - 24

87.      Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

88.      Plaintiff and the Class have conferred a benefit upon Defendants in the form of the money Defendants received from them for the purchase of chips to wager at Defendants' online gambling games.

89.      Defendants appreciate and/or has knowledge of the benefits conferred upon them by Plaintiff and the Class.

90.      Under principles of equity and good conscience, Defendants should not be permitted to retain the money obtained from Plaintiff and the members of the Class, which Defendants have unjustly obtained as a result of their unlawful operation of unlawful online gambling games. As it stands, Defendants have retained millions of dollars in profits generated from their unlawful games of chance and should not be permitted to retain those ill-gotten profits.

91.      Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendants have retained as a result of the unlawful and/or wrongful conduct alleged herein.

## X.  PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

a.      Certifying this case as a Class action on behalf of the Class defined above, appointing Plaintiff as representative of the Class, and appointing her counsel as Class counsel;

b.      Declaring that Defendants' conduct, as set out above, violates the CPA;

c.      Entering judgment against Defendants, in the amount of the losses suffered by Plaintiff and each member of the Class;

CLASS ACTION COMPLAINT - 25

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

d.      Enjoining Defendants from continuing the challenged conduct;

e.      Awarding damages to Plaintiff and the Class members in an amount to be determined at trial, including trebling and/or punitive damages as appropriate;

f.      Awarding restitution to Plaintiff and Class members in an amount to be determined at trial, and requiring disgorgement of all benefits that Defendants unjustly received;

g.      Awarding reasonable attorney's fees and expenses;

h.      Awarding pre- and post-judgment interest, to the extent allowable;

i.      Entering judgment for injunctive and/or declaratory relief as necessary to protect the interests of Plaintiff and the Class; and

j.      Awarding such other and further relief as equity and justice require.

## XI.  JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted this 11th day of February, 2019.

TOUSLEY BRAIN STEPHENS PLLC

By: *s/ Janissa A. Strabuk*
    Janissa A. Strabuk, WSBA #21827
    jstrabuk@tousley.com

By: *s/ Cecily C. Shiel*
    Cecily C. Shiel, WSBA #50061
    cshiel@tousley.com

    1700 Seventh Avenue, Suite 2200
    Seattle, Washington  98101
    Telephone:  206.682.5600
    Fax: 206.682.2992

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

EDELSON PC
Rafey Balabanian*
rbalabanian@edelson.com
Todd Logan*
tlogan@edelson.com
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Benjamin H. Richman*
brichman@edelson.com
350 North LaSalle Street, Suite 1400
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378


*Pro hac vice admission to be sought.

**Attorneys for Plaintiff and the Putative Class**

0099/002/532562.1

CLASS ACTION COMPLAINT - 27