The Honorable Ronald B. Leighton

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

| | |
|---|---|
| CHERYL KATER and SUZIE KELLY, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>CHURCHILL DOWNS INCORPORATED, a Kentucky corporation, and BIG FISH GAMES, INC., a Washington corporation.<br><br>*Defendants*. | No. 3:15-cv-00612-RBL<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND LIMITED RELIEF FROM LITIGATION STAY**<br><br>NOTE ON MOTION CALENDAR: October 17, 2019<br><br>HEARING DATE: November 4, 2019 |
| MANASA THIMMEGOWDA, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>BIG FISH GAMES, INC., a Washington corporation; ARISTOCRAT TECHNOLOGIES INC., a Nevada corporation; ARISTOCRAT LEISURE LIMITED, an Australian corporation; and CHURCHILL DOWNS INCORPORATED, a Kentucky corporation,<br><br>*Defendants*. | No. 2:19-cv-00199-RBL<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND LIMITED RELIEF FROM LITIGATION STAY**<br><br>NOTE ON MOTION CALENDAR: October 17, 2019<br><br>HEARING DATE: November 4, 2019 |

Plaintiffs' Reply ISO Motion for TRO
Nos. 3:15-CV-00612-RBL, 2:19-CV-00199-RBL

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

Defendants insist they have acted properly, but their words don't line up with their actions. They assure the Court that the pop-up window they foisted upon putative class members was intended only to provide "additional information" about the Terms of Use, but the pop-up expressly required putative class members to click a button that says, "I AGREE TO THE TERMS OF USE." They insist that they have not been misleading, but statements in their brief about the legal import of the pop-up and updated Terms directly conflict with what they told putative class members. And they promise that they haven't acted coercively, an assertion that—now that Plaintiffs have had a brief opportunity to gather evidence in the wake of their emergency TRO filing—proves to be spectacularly false.

Because the issue is not before the Court on this motion for a TRO, Plaintiffs decline Defendants' invitation to litigate the propriety of Big Fish's pre-August Terms of Use and purported arbitration agreement (although the unwarranted assumption that their position on that issue is correct pervades nearly all of Defendants' arguments). Instead, Plaintiffs offer a focused reply showing: (1) that there is sufficient evidence to conclude that Plaintiffs are likely to succeed on the merits of their claim that the August 28 Terms of Use and attendant pop-up were improper communications; (2) that Plaintiffs and putative class members will suffer irreparable harm absent a TRO; and (3) that regardless of its decision on the TRO, the Court should grant limited reprieve from the stay to permit resolution of this serious issue.

### I. Plaintiffs Are Likely to Succeed In Demonstrating that Defendants' Communications Are Improper.

Defendants offer three main reasons why they believe Plaintiffs are unlikely to succeed on the merits. First, they contend that their communications aren't coercive, and that Plaintiffs have no proof to the contrary. But Plaintiffs don't have to prove their entitlement to relief to obtain a TRO, nevertheless, they have attached substantial evidence to their reply, now that they have had time to gather it. Second, Defendants argue that their communications were not misleading. Statements in their brief, however, *directly conflict* with the pop-up and the new

Plaintiffs' Reply ISO Motion for TRO
Nos. 3:15-CV-00612-RBL, 2:19-CV-00199-RBL - 1

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

Terms. Third, Defendants contend that they aren't trying to discourage participation in these cases, but that just isn't credible.

### A. Defendants' Communications Are Coercive.

Defendants confuse the requirements to obtain temporary injunctive relief with the requirements for the ultimate relief plaintiff will seek under *Gulf Oil Co. v. Bernard*—exercise of the district court's authority to prevent "abuses" by "limiting communications between parties and potential class members[.]" 452 U.S. 89, 100-02 (1981). They complain that Plaintiffs do not include "any *evidence* that a putative class member was actually coerced by the challenged language[.]" (Opp. 15.) But they fail to recognize that even at the preliminary injunction stage, admissible evidence need not be presented because "[t]he urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). A TRO is even *more* expedited than a preliminary injunction. In the three days between when Plaintiffs learned of the new pop-up and when they filed their TRO motion, they simply did not have time to gather declarations proving that putative class members were coerced by Defendants' pop-up. Under these circumstances, the allegations in the complaint about the nature of Big Fish Casino, the inherently coercive nature of forcing people to click "I Agree" in order to access their paid-for chips, and Dr. Schüll's letter are sufficient evidence to grant this preliminary relief.

In any event, Plaintiffs have now obtained exactly the evidence Defendants complain was lacking. Fifteen players who have collectively lost an estimated $1.6 million at Defendants' gambling games have provided declarations explaining their Big Fish Casino addictions.[1] Many

---

[1] (*See* Ex. A, Decl. of Jill Interrante; Ex. B, Decl. of Crystal Fair; Ex. C, Decl. of Patsy Henson; Ex. D, Decl. of Brandt Jennings; Ex. E, Decl. of Floyd Moon; Ex. F, Decl. of Michael Etcheverry; Ex. G, Decl. of Dawn Milliken; Ex. H, Decl. of Rhonda Martinez; Ex. I, Decl. of Crystal Oland; Ex. J, Decl. of James Bennett; Ex. K, Decl. of Elizabeth Cash; Ex. L, Decl. of Jane Doe 2; Ex. M, Decl. of Jane Doe 3; Ex. N, Decl. of Jane Doe 4; Ex. O, Decl. of Tina Oliver.)

Plaintiffs' Reply ISO Motion for TRO
Nos. 3:15-CV-00612-RBL, 2:19-CV-00199-RBL - 2

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

have made a substantial sacrifice by placing their names and deeply personal stories into the public record. While 12 pages isn't enough to recount all of these experiences, a few examples suffice to demonstrate the coercive nature of Defendants' actions.

Jill Interrante started playing Big Fish Casino so that she "could talk to people and they couldn't see [her] crying on the inside." (Ex. A ¶ 1.) *See also* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) § 312.31 ["DSM-V"] (noting that one diagnostic criterion for gambling disorder is that the person "[o]ften gambles when feeling distressed (e.g., helpless, guilty, anxious, depressed)"). Since then, she has lost in excess of $200,000 on Big Fish Casino, is in "financial ruins" from playing the game, knows that she is addicted, and can't stop playing. (Ex. A ¶¶ 3-4.) Big Fish is well aware that she is having these problems—she has called and emailed repeatedly—but it has largely ignored her, except to present her with an arbitration agreement that it told her she must accept in order to keep playing the game it knows she is addicted to. (*Id.* ¶¶ 4, 7.)

Ms. Interrante's experience is far from unique. Crystal Fair has lost half a million dollars in five years and at times has played nearly 24 hours a day. (Ex. B ¶¶ 2-3.) Patsy Henson, who has lost at least $59,000 in nearly 700 transactions at Big Fish Casino, describes getting "lulled into almost a trance, one bet after another" until two or four in the morning, skipping meals and only getting up to "go to the bathroom when it becomes an emergency." (Ex. C ¶ 3, 6.) She has tried "numerous times to stop" but "continue[s] to play no matter what the cost." (*Id.* ¶ 3.) *See also* DSM-V ("Has made repeated unsuccessful efforts to control, cut back, or stop gambling."). Brandt Jennings, who has lost at least $200,000, started out spending $5 on chips but gradually increased to $600 or $700 a day. (Ex. D ¶¶ 3-4.) *See also* DSM-V ("Needs to gamble with increasing amounts of money in order to achieve the desired excitement."). Jane Doe 2 has lost at least $100,000 and can't submit her declaration publicly because she is fearful that if her husband found out the extent of her losses, it could end her marriage. (Ex. L ¶¶ 2, 4.) *See also*

Plaintiffs' Reply ISO Motion for TRO
Nos. 3:15-CV-00612-RBL, 2:19-CV-00199-RBL - 3

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

DSM-V ("Has jeopardized or lost a significant relationship, job, or educational or career opportunity because of gambling.").

Whether Defendants' games caused these addictions or merely exploited them is a matter for another time. For now, it suffices to say that Plaintiffs have a high likelihood of success on their argument that telling addicted gamblers they have to agree not to participate in a class action in order to keep playing—when some of them can't even stop playing to *eat or use the bathroom*—is coercive.

Apart from the addiction issue, Plaintiffs argued in their motion that Defendants' pop-up was "inherently coercive" because it purported to force putative class members "to give up a paid-for benefit and end an ongoing business relationship in order to refuse to waive their class action rights." *See McKee v. Audible, Inc.*, No. 17-cv-1941, 2018 WL 2422582, at *6 (C.D. Cal. Apr. 6, 2018). And indeed, putative class members have submitted affidavits stating that they are unable to access their chip bankrolls without agreeing to Defendants' pop-up. Floyd Moon, who has sunk more than $175,000 into Big Fish Casino, has between $3,000 and $6,000 worth of chips in his account and says that once Big Fish shows him the pop-up, "[t]he pressure [he] would feel to accept the new Terms of Use so that [he] could access [his] chips is huge." (Ex. E ¶ 7.) Another declarant estimates that she has over $10,000 worth of chips sitting in her account. (Ex. L ¶ 7.) And while Defendants argue that the opt-out provision obviates these problems, that is false, as explained in detail in section I.B below.

Defendants know that by putting this pop-up into their addictive game, they are bringing to bear enormous psychological pressure on their users to agree not to participate in these cases. Acting assuredly through their lawyers, they carefully provide only limited information about the Terms of Use and, fail to advise class members of the importance of consulting counsel, and as discussed below, mislead putative class members into believing that agreeing to arbitration is the *only* way that they can continue to play the game. Plaintiffs are likely to succeed in demonstrating that Defendants' communications are unfair and coercive.

Plaintiffs' Reply ISO Motion for TRO
Nos. 3:15-CV-00612-RBL, 2:19-CV-00199-RBL - 4

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

### B. Defendants Effectively Concede that the Pop-up Was Misleading.

When sending class notice, courts craft communications extremely carefully using "easily understood language" to avoid confusing people who don't routinely interact with the legal system. *See* Fed. R. Civ. P. 23(c)(2)(B). Defendants, by engaging in unauthorized and misleading communications with putative class members, have upended that paradigm here. And while Defendants claim that the communications were not misleading, the differences between what they said to the Court and what they said to putative class members is striking.

One of Defendants' main arguments, repeated throughout their brief, is that they did not act improperly because they purportedly provided putative class members with a way to opt out of the arbitration provision. That is functionally an admission that the statement in the pop-up displayed to putative class members was false. The text of the pop-up reads in relevant part:

> We've updated our TERMS OF USE, which include mandatory arbitration and class action waiver provisions that apply to past, current, and future disputes. By clicking the button below or continuing to access this game, you agree to the Terms of Use. **This means you will not be able to participate in the class action lawsuits filed in the Western District of Washington (Case Nos. 15-cv-00612-RBL and 2:19-cv-00199-RBL).**

(Grossman Decl. Ex. F) (formatting omitted) (emphasis added). But in their brief, Defendants state that "users who have accepted the [Terms of Use] still have the right to pursue a claim for appropriate relief, either via arbitration *or through litigation if they timely opted out of the Arbitration Provision*." (Opp. 16) (emphasis added). That is the opposite of the pop-up's unqualified statement that continuing to play Big Fish Casino means agreeing not to participate in these class actions.

Defendants argue that the Terms of Use provided appropriate clarification regarding players' ability to opt out of arbitration. Even if that were true, it would only further prove that the pop-up is misleading, silent as it is on the possibility of opting out. In fact, it isn't true. The first paragraph of the Terms does indeed explain the opt-out provision, but the immediately following paragraph tells players that "The mandatory arbitration provision in these Terms of Use prevents you from participating in these class action lawsuits, even if a class is certified[,]"

Plaintiffs' Reply ISO Motion for TRO
Nos. 3:15-CV-00612-RBL, 2:19-CV-00199-RBL - 5

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

with no explanation of what happens if someone has opted out. (Grossman Decl. Ex. E at 1.) Only a lawyer would think it clear that a person could opt out from something "mandatory." To the untrained eye, this is at the very least, extremely confusing. Even to the trained eye, it's not clear how much the opt-out provision protects players. Defendants are silent on whether they will argue, for example, that opt-outs received after the pop-up are ineffective because they were submitted more than 30 days after August 28. Putative class members should not be forced to navigate the consequences of their interactions with this complex litigation on their own, merely because Defendants have been able to delay consideration of class certification.[2]

Defendants next argue that the communications are not misleading because it "disclose[s] the existence of the pending litigation and the impact of the mandatory arbitration provision on putative class members' ability to participate in existing litigation." (Opp. 9.) But they cite no authority for the proposition that including *solely* that information makes their communication proper. To the contrary, it is "erroneous" to assert that "including the name of the case and the explanation that it was a putative class action" is sufficient to render a communication permissible. *County of Santa Clara v. Astra USA, Inc.*, No. 05-cv-03740, 2010 WL 2724512, at *4 (N.D. Cal. July 8, 2010). Defendants were "required to provide enough information so that the recipients would not be misled about the strength or extent of the claims and the purpose of Rule 23 was not frustrated." *See id.* Defendants' communications omit not only the status of the pending arbitration motions, but also the type of relief Plaintiffs seek (refund of money lost at the

---

[2] Unlike most putative class members, Defendants do have lawyers, and it appears likely that those lawyers wrote both the pop-up and the August Terms of Use. (*See* Decl. of Lindsey Barnhart) (attesting to changes in Terms of Use based on personal knowledge). That raises the serious matter of Washington Rule of Professional Conduct Rule 4.3. In "situations involving unrepresented persons whose interests may be adverse to those of the lawyer's client … the possibility that the lawyer will compromise the unrepresented person's interests is so great that [Rule 4.3] prohibits the giving of any advice, apart from the advice to obtain the services of another legal practitioner." Wash. R. Prof'l Conduct 4.3, cmt. 2. Defendants' counsel should provide legal advice—such as "information regarding the effect of the Arbitration Provision"—to unrepresented putative class members with adverse interests. *Cf. St. Barnabas Hosp., Inc. v. Ovation Pharma., Inc.*, No. 09-cv-1375, 2010 WL 11574952, at *2 (D. Minn. June 24, 2010) (finding Minnesota's Rule 4.3 not to apply in similar situation "because Defendants' counsel clearly communicated that his client's interests are adverse to the potential class members").

Plaintiffs' Reply ISO Motion for TRO
Nos. 3:15-CV-00612-RBL, 2:19-CV-00199-RBL - 6

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

game), the existence of the Ninth Circuit's *Kater* decision, and this Court's holding that requiring Kater to arbitrate her claims would be prejudicial. *See Astra*, 2010 WL 2724512, at *4 (noting that the defendant's communication "neglected to advise the putative plaintiff class that the Ninth Circuit had blessed plaintiffs' legal theory").

Defendants' reliance upon *Nugussie v. HMS Host N. Am.*, No. 16-cv-0268RSL, 2017 WL 1250420, at *2 (W.D. Wash. Apr. 5, 2017), to excuse their actions is misplaced. They fail to mention that *Nugussie* involved only a "single communication" to a putative class member—a settlement offer that "notified [her] of the passage of the SeaTac wage ordinance, this lawsuit (including the claims asserted, the relief sought, and that plaintiff would be part of the class if certified), *how to contact plaintiffs' counsel*, and the method by which the offered payment was calculated[.]" *Id.* (emphasis added). That's a far cry from Defendants' attempt to coerce putative class members into consigning their claims to arbitration, without any admonition to seek counsel, let alone provision of contact information for Plaintiffs' counsel. Defendants reliance on *Nugussie* also undermines their attempt to distinguish both *Astra* and *Grewe v. Cobalt Mortgage, Inc.*, No. 16-cv-0577, 2016 WL 4211530, at *3 (W.D. Wash. Aug. 10, 2016), which they say do not apply because those cases involve settlements. In fact, the test for improper settlement offers to putative class members "is concomitant" with the test for whether communications to putative class members are abusive generally. *Astra*, 2010 WL 2724512, at *3.

The Northern District of California's unpublished decision in *Adtrader, Inc. v. Google LLC*, No. 17-cv-07082, 2018 WL 1876950 (N.D. Cal. Apr. 19, 2018) is also not to the contrary, and certainly cannot "foreclose" Plaintiffs' arguments. (Opp. 19.) There, Google undertook a "robust notification campaign" including a "red-alert bar notice … which asked them to … choose to accept, decline, or defer by clicking a radio button at the bottom of the notice[]" *before* any class action litigation was filed. *Adtrader*, 2018 WL 1876950, at *1-2 (notification campaign occurred in August and September 2017, while the lawsuit was filed in December 2017). The pop-up here was provided only *after* the *Kater* case had been pending for more than four years,

Plaintiffs' Reply ISO Motion for TRO
Nos. 3:15-CV-00612-RBL, 2:19-CV-00199-RBL - 7

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

and it did not offer any option to decline—only to accept. Further, the putative class members in *Adtrader* were commercial entities doing business with Google, not individual consumers with gambling addictions. To the extent that *Adtrader* holds that courts can't act to protect the interests of putative class members before certification, it conflicts with *Gulf Oil*, which clearly permits issuance of an "order limiting communications between parties and potential class members[.]" 452 U.S. at 101. *Adtrader* does not address *Gulf Oil*.

Finally, Defendants' argument assumes that they are going to win their pending motions to compel arbitration. While this is not the time to argue those stayed motions, suffice it to say that the question is indisputably up in the air. The Court denied similar motions in three other related cases and is waiting to consider Defendants' motions pending potentially dispositive appellate review. The pop-up and updated Terms of Use give putative class members absolutely no indication that any of that is occurring. Defendants' communications merely assume, like their brief, that Defendants are right and will prevail. For non-lawyer putative class members—particularly those whose only other experience with class actions is a court-ordered notice of a class action settlement—Defendants' strong implication that these matters are already decided and that there's nothing putative class members can do about it is, on its own, highly misleading.

### C. Defendants Are Attempting to Influence Putative Class Members' Decisions to Participate in this Action.

Plaintiffs are also likely to succeed based on evidence of Defendants' attempt to discourage putative class members from participating in this litigation. Defendants do not dispute that it would be improper to solicit opt-outs; they merely insist that is not what they are doing. But that position can't be squared with Defendants' actions. It is implausible that purely altruistic reasons motivated Defendants to pay their lawyers to update the Terms of Use, then pay their developers to create and deploy a new pop-up window undoubtedly drafted by their lawyers. If the pop-up were merely a "communication of additional information regarding the effect of the Arbitration Provision" that "in no way discouraged participation in these class actions," then

Plaintiffs' Reply ISO Motion for TRO
Nos. 3:15-CV-00612-RBL, 2:19-CV-00199-RBL - 8

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

there would have been no reason to identify these cases *by name*. (Opp. 11.) In fact, no additional communication would have been needed.

Defendants likely intend to use these communications to discourage participation in these class actions. They may simply rely on having created a mistaken belief among putative class members that they can't participate in these cases. If Defendants lose their motions to compel arbitration on the basis that they provided insufficient notice of the Terms (as have, before this Court, other online casinos in related cases), then they will almost certainly argue that putative class members agreed to arbitration when they clicked "I Agree" on the pop-up. Unless Defendants are willing to disavow that position, their argument that they aren't trying to affect putative class members' legal rights with respect to this litigation is extraordinarily disingenuous.

Whether this involves misleading communications, an unauthorized opt-out campaign, or both, Defendants' actions here are obnoxious to the orderly administration of justice. *See*, *e.g.*, *Shulman v. Becker & Poliakoff, LLP*, No. 17-cv-9330, 2018 WL 4961003, at *3 (S.D.N.Y. Oct. 15, 2018) ("[J]udicial intervention is warranted when communications pose 'a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally.'"); *Keystone Tobacco Co., Inc v. U.S. Tobacco Co.*, 238 F. Supp. 2d 151, 154–55 (D.D.C. 2002) ("The effect of a defendant attempting to influence potential plaintiffs not to join a potential class action is just as damaging to the purposes of Rule 23 as a defendant that influences members of an already certified class to opt out.") (quoting *Jenifer v. Delaware Solid Waste Auth.*, No. Civ. A. 98-270, 1999 WL 117762, at *2 (D. Del. 1999)). Plaintiffs are likely to be able to demonstrate that the communications were improper.

## II.     The Harm to Putative Class Members Is Non-Speculative and Irreparable.

Defendants' position regarding irreparable harm boils down to two points. First, they argue at length that because no certified class exists, the Court can't find irreparable harm. That's inaccurate. Even where interim counsel has not been formally appointed, "class attorneys, purporting to represent a class … owe the entire class a fiduciary duty once the class complaint is

Plaintiffs' Reply ISO Motion for TRO
Nos. 3:15-CV-00612-RBL, 2:19-CV-00199-RBL - 9

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

filed." *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003) (citation omitted). The named plaintiffs, for their part, have a significant personal economic interest in proceeding with this case as a class action in court. *Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 338 & n.9 (1980). Defendants' conduct is directed at convincing putative class members not to participate in these cases, which directly impacts that interest.

In addition, Rule 23(d) clearly permits the Court to restrict communications with putative class members about the litigation, and it requires the Court to consider the effect that communications have on the putative class members, not on the named plaintiffs. *Gulf Oil*, 452 U.S. at 100. Given that Plaintiffs are authorized to seek this ultimate relief on behalf of the putative class, it would be strange if they were not permitted to seek *temporary* relief directed at exactly the same thing. Under Defendants' view, a TRO restricting Defendants' misleading communications to putative class members could never issue under any circumstances, because the named plaintiffs—being represented by counsel—aren't likely to be misled.

Second, Defendants contend that the harm is not irreparable. However, instead of meaningfully distinguishing the cases that hold that misleading putative class members is likely irreparable harm, they merely point out irrelevant factual and procedural differences between those cases and these. Defendants also point to a narrow set of circumstances—the case where they win their motions to compel arbitration—where it is possible that no irreparable harm will result from their misleading communications. But the TRO standard doesn't require Plaintiffs to show that irreparable harm will certainly result if relief isn't granted, only "that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Plaintiffs have done so.

In any event, later in their brief, Defendants identify the *exact* irreparable harm that will occur absent a TRO: "genuine and significant customer frustration and confusion[.]" (Opp. 22.) But while Defendants try to spin that harm as affecting them, it's unquestionably bad for absent class members. If Defendants had maintained the status quo instead of taking advantage of the

Plaintiffs' Reply ISO Motion for TRO
Nos. 3:15-CV-00612-RBL, 2:19-CV-00199-RBL - 10

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

litigation stay to make misleading and coercive communications to putative class members for the purpose of gaining strategic advantage, then none of this would have happened. According to Defendants, only 30% of Big Fish players have seen the misleading pop-up so far. That means there is still time to stop Defendants from misleading the remaining 70%. Absent a TRO, Defendants will continue to disseminate their misleading information, causing irreparable harm.

### III. Regardless of Whether a TRO Is Granted, the Court Should Set Aside the Stay to Resolve this Matter.

Finally, Defendants offer no direct response to Plaintiffs' argument that the Court should grant a limited reprieve from the litigation stay in order to consider this issue. Regardless of whether Plaintiffs have demonstrated their entitlement to a TRO, Defendants' misleading communications create a problem that should not wait months or years to be solved. As explained above, failure to curb this type of abusive behavior will be detrimental to the Court's ability to administer these cases.

One way to resolve the issue would be for the Court to find that Defendants' communications were misleading and invalidate any purported arbitration agreement that they may have obtained by way of the pop-up or the August 28 terms. That resolution would be in line with many other courts' solutions to similar problems. *See*, *e.g.*, *Balasanyan v. Nordstrom, Inc.*, No. 10-CV-2671-JM-WMC, 2012 WL 760566, at *4 (S.D. Cal. Mar. 8, 2012); *Jimenez v. Menzies Aviation Inc.*, No. 15-CV-02392-WHO, 2015 WL 4914727, at *5 (N.D. Cal. Aug. 17, 2015); *Astra*, 2010 WL 2724512, at *3. The Court could then order corrective notice, direct a return to the pre-filing status quo with respect to the arbitration provision, and prevent Defendants from communicating with putative class members about any arbitration agreement.

Another solution would be to appoint Plaintiffs' counsel as interim counsel pursuant to Rule 23(g)(3) to act on behalf of the putative class for the purpose of communicating with Defendants regarding any attempt to impose a post-dispute arbitration provision, including deciding whether to accede to such a provision. As the Court has already recognized, sending these cases to an arbitrator who is not bound by the Ninth Circuit's holding in *Kater* would

Plaintiffs' Reply ISO Motion for TRO
Nos. 3:15-CV-00612-RBL, 2:19-CV-00199-RBL - 11

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

disadvantage Plaintiffs' position. (*See* dkt. 75 at 10-11.) The Court has also signaled the strength of Plaintiffs' position on the merits. (*See id.* at 8.) When deciding whether to participate in these cases, putative class members deserve to know—or to be represented by someone who knows— the whole story. An appointment of interim class counsel could be done in conjunction with invalidating Defendants' attempt to change the Terms of Use, *see Astra*, 2010 WL 2724512, at *6, or the Court could extend the 30-day opt-out in the Terms of Use period by a reasonable time, *see O'Connor v. Uber Techs., Inc.*, No. C-13-3826 EMC, 2013 WL 6407583, at *7 (N.D. Cal. Dec. 6, 2013). As interim class counsel, Plaintiffs' counsel could determine whether it was appropriate to opt all putative class members out of the arbitration provision, then send opt-out notices to the Defendant on putative class members' behalf. The appointment could also provide that any further changes to the Terms of Use that relate to this litigation would need to be communicated to interim class counsel, rather than directly to putative class members, which would prevent this problem from reoccurring in the future without limiting Defendants' speech rights beyond the customary restrictions on speaking to represented parties.[3]

On this motion, the Court need not necessarily decide which avenue of relief, if any, is warranted. Plaintiffs raise these issues to demonstrate that it is appropriate for the Court to lift the stay and resolve this issue quickly, and Plaintiffs respectfully request that the Court do so.

DATED this 31st day of October, 2019.

By: s/ Janissa A. Strabuk

---

[3] Defendants cite a single district court case which they say stands for the proposition that "putative class members are not represented unless and until a class is certified." (Opp. 22.) In fact, that court merely held that the order appointing interim class counsel *in that particular case* was not intended to create an attorney-client relationship. That doesn't make it categorically impossible.

Plaintiffs' Reply ISO Motion for TRO
Nos. 3:15-CV-00612-RBL, 2:19-CV-00199-RBL - 12

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

TOUSLEY BRAIN STEPHENS PLLC
Janissa A. Strabuk, WSBA #21827
jstrabuk@tousley.com
Cecily C. Shiel, WSBA #50061
cshiel@tousley.com
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600

Alexander G. Tievsky*
atievsky@edelson.com
EDELSON PC
350 N LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370 / Fax: 312.589.6378

Rafey S. Balabanian*
rbalabanian@edelson.com
Todd Logan*
tlogan@edelson.com
Brandt Silver-Korn*
bsilverkorn@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300 / Fax: 415.373.9435

*Admitted *pro hac vice*

*Attorneys for Cheryl Kater, Suzie Kelly and Manasa Thimmegowda*

Plaintiffs' Reply ISO Motion for TRO
Nos. 3:15-CV-00612-RBL, 2:19-CV-00199-RBL - 13

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992