The Honorable Robert S. Lasnik

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| CHERYL KATER and SUZIE KELLY, individually and on behalf of all others similarly situated, | No. 15-cv-00612-RSL |
| *Plaintiffs*, | **CLASS COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES AND ISSUANCE OF INCENTIVE AWARDS** |
| *v.* | |
| CHURCHILL DOWNS INCORPORATED, a Kentucky corporation, and BIG FISH GAMES, INC., a Washington corporation. | Noting Date: January 15, 2021 |
| *Defendants*. | |

| | |
|---|---|
| MANASA THIMMEGOWDA, individually and on behalf of all others similarly situated, | No. 19-cv-00199-RSL |
| *Plaintiffs*, | **CLASS COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES AND ISSUANCE OF INCENTIVE AWARDS** |
| *v.* | |
| BIG FISH GAMES, INC., a Washington corporation; ARISTOCRAT TECHNOLOGIES INC., a Nevada corporation; ARISTOCRAT LEISURE LIMITED, an Australian corporation; and CHURCHILL DOWNS INCORPORATED, a Kentucky corporation, | Noting Date: January 15, 2021 |
| *Defendants*. | |

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...........................................................................................................1

BACKGROUND .............................................................................................................2

I.      Class Counsel's 2015 Social Casino Lawsuits, Including *Kater*. ....................3

II.     Class Counsel Appeals The *Kater* Dismissal And The Ninth Circuit Reverses. ..........4

III.    Class Counsel's Post-Appeal Litigation Conduct Before This Court. .........................5

IV.     Class Counsel's Litigation-Adjacent Efforts On Behalf Of The Class. .......................8

The Settlement Now Before The Court. ............................................................................11

ARGUMENT ................................................................................................................12

I.      The Court Should Award Class Counsel 25% Of The $155 Million Common
        Fund. ..............................................................................................................12

        A.      Class Counsel Obtained an Unprecedented Result for the Class. .................13

        B.      Class Counsel's Efforts Generated Non-Monetary Benefits. .........................16

        C.      Pursuing this Litigation on a Contingent Basis Was Extremely Risky for
                Class Counsel. ...................................................................................18

        D.      The Market Supports the Requested Fee. ...............................................22

        E.      The Court Should Not Conduct a Lodestar Cross-Check. ...........................23

II.     Class Counsel's Reasonably-Incurred Expenses Should Be Reimbursed. ..................27

III.    The Court Should Give Cheryl Kater And Manasa Thimmegowda Incentive
        Awards Of $10,000 Each, And Should Give Suzie Kelly An Incentive Award of
        $50,000. ............................................................................................................28

CONCLUSION .............................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**United States Supreme Court Cases**

*Frank v. Gaos*,
    139 S. Ct. 1041 (2019) ...................................................................................15

**United States Circuit Court of Appeals Cases**

*Campbell v. Facebook*,
    951 F.3d 1106 (9th Cir. 2020) .........................................................................24

*Farrell v. Bank of America Corp.*,
    827 F. App'x 628, 635 (9th Cir. 2020)..............................................................24

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .........................................................................24

*In re Bluetooth Headset Prod. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ...........................................................................24

*In re Google Referrer Header Privacy Litig.*,
    869 F.3d 737 (9th Cir. 2017) ...........................................................................15

*In re HP Inkjet Printer Litig.*,
    716 F.3d 1173 (9th Cir. 2013) .............................................................13, 16, 22

*In re Hyundai & Fuel Econ. Litig.*,
    926 F.3d 539 (9th Cir. 2019) ...........................................................................24

*In re Optical Disk Drive Prods. Antitrust Litig.*,
    959 F.3d 922 (9th Cir. 2020) ...............................................................13, 18, 22

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) ...........................................................................23

*Kater v. Churchill Downs*,
    886 F.3d 784 (9th Cir. 2018) .............................................................................4

*Mason v. Mach. Zone, Inc.*,
    851 F.3d 315 (4th Cir. 2017) ..................................................................1, 3, 20

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ...........................................................................29

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) ........................................................................24

*Stanger v. China Elec. Motor, Inc.*,
    812 F.3d 734 (9th Cir. 2016) ..........................................................................24

*Steiner v. Am. Broad. Co.*,
    248 F. App'x 780 (9th Cir. 2007) ....................................................................18

*Vincent v. Hughes Air W., Inc.*,
    557 F.2d 759 (9th Cir. 1977) ..........................................................................27

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) .................................................................*passim*

*Wininger v. SI Mgmt. L.P.*,
    301 F.3d 1115 (9th Cir. 2002) ........................................................................27

**United States District Court Cases**

*Acosta v. Frito-Lay, Inc.*,
    No. 15-CV-02128-JSC, 2018 WL 646691 (N.D. Cal. Jan. 31, 2018) ...............27

*Bell v. Consumer Cellular, Inc.*,
    No. 15-cv-941, 2017 WL 2672073 (D. Or. June 21, 2017) ..............................29

*Chehalem Physical Therapy v. Coventry Health Care, Inc.*,
    No. 03:09-CV-00320-HU, 2014 WL 4373150 (D. Or. Sept. 3, 2014) ..............29

*del Toro Lopez v. Uber Techs., Inc.*,
    No. 17-cv-6255, 2018 WL 5982506 (N.D. Cal. Nov. 14, 2018) .......................30

*Dennings v. Clearwire Corp.*,
    No. C10-1859-JLR, 2013 WL 1858797 (W.D. Wash. May 3, 2013) ...............28

*Dupee v. Playtika Santa Monica, et al.*,
    No. 15-cv-01021 (N.D. Ohio) ................................................................3, 4, 20

*Ikuseghan v. Multicare Health Sys.*,
    No. 3:14-cv-05539 BHS, 2016 WL 3976569 (W.D. Wash. July 25, 2016).......24

*In re Anthem, Inc. Data Breach Litig.*,
    327 F.R.D. 299 (N.D. Cal. 2018) ...................................................................15

*In re Apple In-App Purchase Litigation*,
    No. 5:11-CV-01758 EJD, 2013 WL 1856713 (N.D. Cal. May 2, 2013) ..........14

*In re High-Tech Emp. Antitrust Litig.*,
    No. 11-cv-2509, 2014 WL 10520478 (N.D. Cal. May 16, 2014) ....................................31

*In re HQ Sustainable Mar. Indus., Inc. Derivative Litig.*,
    No. C11-910 RSL, 2013 WL 5421626 (W.D. Wash. Sept. 26, 2013) .............................24

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    No. 4:14-MD-2541-CW, 2017 WL 6040065 (N.D. Cal. Dec. 6, 2017)...........................13

*In re Volkswagen "Clean Diesel" Marketing Sales Practices, & Products Liability Litigation*,
    No. 2672 CRB (JSC), 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017) .............................26

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    No. 16-MD-02752-LHK, 2020 WL 4212811 (N.D. Cal. July 22, 2020).........................15

*Kim v. Tinder, Inc.*,
    No. CV 18-3093-JFW(ASX), 2019 WL 2576367 (C.D. Cal. June 19, 2019) .................15

*Kater v. Churchill Downs Inc.*,
    No. 15-cv-612 (W.D. Wash) .................................................................................*passim*

*Mason v. Mach. Zone, Inc.*,
    No. 15-cv-01107 (D. Md.)..................................................................................1, 3, 20

*McClintic v. Lithia Motors, Inc.*,
    No. C11-859RAJ, 2011 WL 13127844 (W.D. Wash. Oct. 19, 2011)..............................29

*Pan v. Qualcomm Inc.*,
    No. 16-cv-1885, 2017 WL 3252212 (S.D. Cal. July 31, 2017).......................................30

*Phillips v. Double Down Interactive LLC*,
    No. 15-cv-04301 (N.D. Ill.)................................................................................3, 4, 20

*Ristic v. Mach. Zone, Inc.*,
    No. 15-cv-08996 (N.D. Ill.)................................................................................3, 4, 20

*Thimmegowda v. Big Fish Games*,
    No. 19-cv-199 (W.D. Wash.) ..................................................................................5, 6

*Van Vranken v. Atl. Richfield Co.*,
    901 F. Supp. 294 (N.D. Cal. 1995).................................................................................30

*Vizcaino v. Microsoft Corp.*,
    142 F. Supp. 2d 1299 (W.D. Wash. 2001) ...............................................................12, 19

*Wilson v. Huuuge, Inc.*,
No. 18-cv-05276 (W.D. Wash.) ...........................................................................6, 18

**State Court Cases**

*Bowles v. Dep't of Ret. Sys.*,
121 Wash.2d 52, 847 P.2d 440 (1993) ...........................................................12

**Miscellaneous Authority**

*Addicted to losing: How casino-like apps have drained people of millions*,
NBC NEWS (Sept. 14, 2020), *available at* https://nbcnews.to/39Lo1X1 .........................11

Brian T. Fitzpatrick, *The Conservative Case for Class Actions*,
University of Chicago Press, Oct 30, 2019 .......................................................26

Dean Takahashi, *13 predictions for the future of the $3.4B social casino games market*,
GAMESBEAT (Oct. 19, 2015, 6:00 AM), *available at* https://bit.ly/37TPao9......................2

Fed. R. Civ. P. 23 .......................................................................................7

*Harpooned by Facebook*,
REVEAL-CENTER FOR INVESTIGATIVE REPORTING (Aug. 3, 2019), *available at*
https://bit.ly/39NIdri ...............................................................................11

H.B. 2041, 66th Leg., Reg Sess. (Wash. 2019).......................................................9, 10

H.B. 2720, 66th Leg., Reg. Sess. (Wash. 2020).......................................................9, 10

*How social casinos leverage Facebook user data to target vulnerable gamblers*,
PBS NEWSHOUR (Aug. 13, 2019), *available at* https://to.pbs.org/3lPRd1m....................11

Maine H.P. 35 – L.D. 34, 2019 .......................................................................21

Melissa Santos, *'Free' casino apps prey on addiction, users say, and WA lawmakers are
considering a crackdown*,
CROSSCUT (Feb. 7, 2020), *available at* https://bit.ly/3hfFxDl ..........................11

Myriam Gilles & Gary B. Friedman, *Exploding the Class Action Agency Costs Myth: The Social
Utility of Entrepreneurial Lawyers*,
155 U. PA. L. REV. 103 (2006)........................................................................25

Phillip Conneller, *Washington State Social Gaming Legislation Could Rescue Big Fish Casino
From Legal Trouble*,
CASINO.ORG (Jan. 29, 2020), *available at* https://bit.ly/39dKtWM ...................9

S.B. 5886, 66th Leg., Reg. Sess. (Wash. 2019).......................................................9, 10

S.B. 6568, 66th Leg., Reg. Sess. (Wash. 2020)..................................................................9

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

1

**INTRODUCTION**

2      After five years of hard-fought litigation, Class Counsel[1] negotiated a non-reversionary

3  $155 million common fund settlement that, if finally approved, will completely resolve these

4  cases. The Settlement represents a watershed moment for consumer victims of the social casino

5  industry, who have long alleged that social casino games constitute unlawful gambling. It is also

6  an exceptionally strong settlement, both in terms of its absolute size and in terms of the

7  individual cash relief it will afford to Class Members. For many, the settlement checks, set to be

8  delivered in the midst of a pandemic-caused recession, will be life changing: five- and six-figure

9  credit card debts will be wiped out; home equity lines of credit will be paid off; and other debts

10  caused by playing Defendants' games will be erased overnight.

11      These would be strong results in a slam-dunk class action alleging well-trodden claims.

12  What makes this settlement truly historic, though, is that the underlying claims represent Class

13  Counsel's novel and previously-untested interpretation of state gambling laws—and that Class

14  Counsel pressed forward with that theory for years, in the face of extraordinary risk and repeated

15  setbacks across various courts and other fora, until finally reaching this landmark settlement.

16  When a federal court accuses plaintiffs' attorneys pursuing a novel theory of "shoveling smoke"

17  by making "hollow claims lacking allegations of real-world harms or injuries,"[2] a lot of firms,

18  indeed probably most, would call it a day. When five more courts dismiss the claims on the

19  pleadings, it is the rare firm that perseveres, prevails before the Court of Appeals, redoubles its

20  efforts to take on an entire industry, defeats an onslaught of motion practice from a Who's Who

21  of powerful defense firms, and ultimately recovers hundreds of millions of dollars for

22  consumers. Yet that is what Class Counsel did here, and the settlement now before the Court was

23  only made possible by Class Counsel's unwavering determination to achieve justice for the

24  Class.

25

---

26  [1]      All capitalized terms herein are defined in the Class Action Settlement Agreement (Dkt. 218-1 in No. 15-cv-612, *Kater v. Churchill Downs*) unless otherwise noted. Likewise, all "Dkt." citations are to the *Kater* docket.

27  [2]      *Mason v. Mach. Zone, Inc.*, 140 F. Supp. 3d 457, 469 n.20 (D. Md. 2015), *aff'd*, 851 F.3d 315 (4th Cir. 2017)

---

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

1    Notwithstanding these exceptional results, Class Counsel seek only the "benchmark" fee

2    award of 25% of the Settlement Fund (substantially less than the 30% they are permitted to seek

3    under the Settlement), in addition to reimbursement of nearly $2 million in reasonably-incurred

4    litigation expenses as well as incentive awards for the Class Representatives. As explained

5    further below, and in the attached expert declarations of Professors William B. Rubenstein and

6    Charles M. Silver, the requested award would fairly compensate Class Counsel for the result they

7    achieved and should be granted.

8                                    **BACKGROUND**

9    In 2014, Class Counsel began investigating the burgeoning social casino industry. *See*

10   Declaration of Todd Logan ("Logan Decl.") ¶ 3. The results of that investigation were startling:

11   multinational gambling corporations like Churchill Downs, International Game Technology, and

12   Scientific Games had found a way to smuggle slot machines onto consumers' smart phones

13   without complying with any federal or state gambling laws. *Id.* ¶ 4. By 2015, social casino

14   games like "Big Fish Casino" were capturing more than $3 billion in annual revenues.[3] Those

15   revenues, just like those of Vegas casinos, were disproportionately derived from gambling

16   addicts who just couldn't stop themselves from buying chips and spinning the slots. Moreover,

17   those revenues—at least in Class Counsel's judgment—were entirely ill-gotten gains under a

18   variety of state gambling laws. *See* Logan Decl. ¶ 4.

19   Based on that investigation, in 2015 Class Counsel initiated a nationwide, multi-forum

20   campaign against the social casino industry. As Professor William B. Rubenstein, the sole author

21   of NEWBERG ON CLASS ACTIONS, summarizes that campaign (and its results):

22        Prior to entering academia, I was a lawyer at the national office of the
          American Civil Liberties Union (ACLU) for nearly a decade, during which
23        time I pursued civil rights campaigns on behalf of minority groups. Based
          on that experience, it strikes me that what Class Counsel have pursued here
24        is closer in form to a civil rights litigation campaign than it is to a series of
          discrete class action settlements. Class Counsel saw an injustice – a thinly
25        disguised form of gambling preying on those most vulnerable to addictive

26   _____

27   [3]   *See* Dean Takahashi*, 13 predictions for the future of the $3.4B social casino games market*, GAMESBEAT
     (Oct. 19, 2015, 6:00 AM), *available at* https://bit.ly/37TPao9.

1  gambling – and they sought to fix it. Their goal was not to win a case but to
2  reform an entire industry, much like a civil rights campaign might aim to
   reform a particular type of discriminatory practice across an entire
3  employment sector. To accomplish this end, Class Counsel went far beyond
   what lawyers pursuing a simple class action case would normally do. Class
4  Counsel pursued multiple cases. Class Counsel pursued multiple
   defendants. Class Counsel filed actions in multiple forums. Class Counsel
5  tested various state laws. Class Counsel built websites to help app users
   avoid forced arbitration clauses, lobbied legislators and regulators, and took
6  their efforts to the media. When Class Counsel lost, they did not give up,
   but changed tactics or forums and kept going. And they did all of this with
7  their own funds, risking millions of dollars of their own money to end this
   practice. What they have achieved so far, with these initial settlements, is
8  an astounding accomplishment that begins to chip away at the pernicious
   underlying social casinos .

9  Declaration of Professor William B. Rubenstein ("Rubenstein Decl.") ¶ 2.

10  Because the extraordinary settlement here is but a part of Class Counsel's efforts carrying

11  the banner nationwide for victims of the social casino industry, a summary of Class Counsel's

12  efforts both before this Court and otherwise is provided below.

13  **I.     Class Counsel's 2015 Social Casino Lawsuits, Including *Kater*.**

14  Having concluded that social casinos constitute gambling, between April and October of

15  2015, Class Counsel filed five (5) proposed class action lawsuits, in four (4) different courts,

16  alleging class claims under five (5) different sets of state gambling laws. *See* **(1)** *Mason v. Mach.*

17  *Zone, Inc*., No. 15-cv-01107 (D. Md. Apr. 7, 2015) (alleging claims under California and Illinois

18  gambling laws); **(2)** *Kater v. Churchill Downs Inc.*, No. 15-cv-612 (W.D. Wash. Apr. 17, 2015)

19  (alleging claims under Washington gambling law); **(3)** *Dupee v. Playtika Santa Monica*, No. 15-

20  cv-01021 (N.D. Ohio May 21, 2015) (alleging claims Ohio and Nevada gambling laws); **(4)**

21  *Phillips v. Double Down Interactive LLC,* No. 15-cv-04301 (N.D. Ill.) (removed May 14, 2015)

22  (alleging claims under Illinois gambling laws); **(5)** *Ristic v. Mach. Zone*, *Inc.* No. 15-cv-08996

23  (N.D. Ill. Oct. 9, 2015) (alleging claims under Illinois gambling laws).

24  Each federal district court initially presented with Class Counsel's theory of these

25  cases—*i.e.*, that social casinos are illegal gambling and consequently must return to consumers

26  their ill-gotten gains—squarely rejected it. *See Mason v. Mach. Zone, Inc.*, 851 F.3d 315, 316

27  (4th Cir. 2017); *Kater v. Churchill Downs Inc.*, No. C15-612 MJP, 2015 WL 9839755, at *3

1   (W.D. Wash. Nov. 19, 2015), *rev'd*, 886 F.3d 784 (9th Cir. 2018); *Dupee v. Playtika Santa*

2   *Monica*, No. 15-cv-01021, 2016 WL 795857, at *1 (N.D. Ohio Mar. 1, 2016); *Phillips v. Double*

3   *Down Interactive LLC*, 173 F. Supp. 3d 731, 739 (N.D. Ill. 2016); *Ristic v. Mach. Zone, Inc.*, No.

4   15-CV-8996, 2016 WL 4987943, at *4 (N.D. Ill. Sept. 19, 2016). In representative fashion,

5   Judge Pechman's dismissal order in *Kater* concluded that "Big Fish Casino does not award

6   something of value satisfying the requisite prize element, and therefore the game is not 'illegal

7   gambling' under Washington law." *Kater*, 2015 WL 9839755, at *3.

8   **II.     Class Counsel Appeals The *Kater* Dismissal And The Ninth Circuit Reverses.**

9         Following Judge Pechman's dismissal order in *Kater*, Class Counsel appealed. Merits

10  briefing before the Ninth Circuit concluded in September 2016, and oral argument was held in

11  February 2018. Along the way, Defendant Churchill Downs moved to substitute Big Fish

12  Games, Inc. as the real party in interest, on grounds that as a result of an impending sale it would

13  "soon lack any interest in either Big Fish Games, Inc., or Big Fish Casino." *Kater v. Churchill*

14  *Downs*, No. 16-35010, Dkt. 48 at 6 (9th Cir. 2018). Class Counsel opposed that motion. *See id.*,

15  Dkt. 50 at 3 ("Ms. Kater alleges that Churchill Downs—not Big Fish Games—retained the

16  benefit of what she lost gambling at the Big Fish Casino.")

17        In March 2018, the Ninth Circuit reversed:

18            In this appeal, we consider whether the virtual game platform "Big Fish
             Casino" constitutes illegal gambling under Washington law. Defendant–
19            Appellee Churchill Downs, the game's owner and operator, has made
             millions of dollars off of Big Fish Casino. However, despite collecting
20            millions in revenue, Churchill Downs, like Captain Renault in *Casablanca*,
             purports to be shocked—shocked!—to find that Big Fish Casino could
21            constitute illegal gambling. We are not. We therefore reverse the district
             court and hold that because Big Fish Casino's virtual chips are a "thing of
22            value," Big Fish Casino constitutes illegal gambling under Washington law.

23  *Kater*, 886 F.3d 784, 785 (9th Cir. 2018). In that opinion, the Ninth Circuit dispensed with a

24  variety of the arguments that had persuaded district courts nationwide to initially dismiss the

25  social casino cases. For example, the Court rejected the argument that social casino chips "do not

26  extend gameplay, but only enhance it." *Id.* at 787. The Circuit also rejected Big Fish's argument

27  that the Washington State Gambling Commission ("WSGC" or "Commission") had determined

1    that social casino games aren't gambling, concluding that "these documents do not indicate that

2    the Commission adopted a formal position on social gaming platforms." *Id.* at 788. And the

3    Ninth Circuit explicitly rejected the "the reasoning of other federal courts that have held that

4    certain 'free to play' games are not illegal gambling." *Id.*

5        The Ninth Circuit also denied Churchill Down's motion to be substituted out of the case.

6    *See Kater*, No. 16-35010, Dkt. 55 at 10-11 n.4 (denying Churchill Downs' Rule 43(b) motion).

7    Class Counsel's insistence that Churchill Downs remain in the case benefited the Class

8    enormously, as Churchill Downs ultimately contributed $124 million of the $155 million

9    settlement now before the Court.

10   **III.    Class Counsel's Post-Appeal Litigation Conduct Before This Court.**

11       Upon remand, *Kater* was reassigned to Judge Leighton. Dkt. 59. Churchill Downs

12   promptly moved to compel Kater's case to arbitration, arguing that Kater had previously agreed

13   to Big Fish Games' Terms of Use (and its mandatory arbitration provision). Dkt. 60. Kater

14   opposed, arguing *inter alia* that Churchill Downs had waived any right to compel arbitration by

15   seeking a dismissal on the merits in 2015. *See generally* Dkt. 68. In November 2018 Judge

16   Leighton agreed, denying Churchill Downs' motion because "Churchill Downs waived its right

17   to arbitration when it took its first bite of the apple and chewed thoroughly for over three years."

18   Dkt. 75 at 11. Churchill Downs then answered Kater's complaint in November 2018. Dkt. 76.

19       In February 2019, the Parties began disputing the propriety of adding additional parties

20   into the case. The results of these disputes were two-fold: first, Class Counsel filed an amended

21   complaint in *Kater* adding Suzie Kelly as a Class Representative and adding Big Fish Games as a

22   defendant, *see* Dkt. 85; and second, Class Counsel filed the *Thimmegowda* action as a

23   companion case that expanded the temporal scope of the classes that Class Counsel sought to

24   represent. *See Thimmegowda v. Big Fish Games*, No. 19-cv-199 (W.D. Wash.).

25       The next year of litigation was consumed with motion practice and discovery disputes. In

26   May 2019, in the *Thimmegowda* action, Big Fish moved to compel arbitration, *see*

27   *Thimmegowda* Dkt. 33, and Aristocrat and Churchill Downs moved to dismiss for lack of

personal jurisdiction. *See Thimmegowda* Dkt. 35. The very same day, Big Fish and Churchill Downs moved to compel arbitration in the *Kater* matter. *See* Dkt. 100. With these motions pending, the Parties engaged in protracted negotiations over the manner and scope of discovery, which ultimately resulted in a sixteen-part discovery and scheduling agreement. *See* Dkt. 118. On September 12, 2019, Defendants' arbitration and jurisdiction motions were terminated with leave to refile when Judge Leighton stayed both cases pending the Ninth Circuit's disposition of an arbitration interlocutory appeal on an arbitration issue in a related case, *Wilson v. Huuuge, Inc.*, No. 18-cv-05276 (W.D. Wash.). *See* Dkt. 121.

By the fall, the cases veered further into waters uncharted in the class action space. In October 2019, Big Fish launched a pop-up in its games that—if clicked—purported to bind its players to the "Dispute Resolution Provision," requiring them to arbitrate any claims against Defendants and to cut the relevant statutes of limitations. Dkt. 218 ¶ 3. In response, Plaintiffs moved for a temporary restraining order to enjoin Big Fish from displaying the pop-up. *See* Dkt. 122. After briefing and argument, Judge Leighton granted Plaintiffs' motion in part, labeling Big Fish's pop-up "coercive and misleading." Dkt. 137 at 7. But in the same stroke, Judge Leighton ordered the Parties to propose language regarding any future similar pop-up windows, *see id.*, and after the Parties submitted competing proposals, the Court approved Defendants' proposal. Dkt. 145. With this Court-approved language in hand, Defendants aggressively presented their players with revised pop-ups in December 2019 (and then again in February 2020 and April 2020)—aimed at preventing putative class members, *en masse*, from participating in this litigation. Dkt. 218 ¶ 4.

Plaintiffs responded to this development in "enterprising" fashion, *see* Mar. 4, 2020 Hr'g Tr. at 5:9. Specifically, because the Court-approved language allowed putative class members to opt out of the arbitration provision, Plaintiffs' counsel established a website to help those class members opt out of Big Fish's Dispute Resolution Provision by sending Big Fish's legal department a postcard with the click of a button. *See* Dkt. 159. Within days of the website's launch, scores of putative class members had opted out of Big Fish's Dispute Resolution

Provision. *See* Dkt. 218 ¶ 6. Defendants moved the Court for a Rule 23(d) protective order to immediately shut down Class Counsel's website, *see* Dkt. 164, but that motion was denied. *See* Dkt. 185. Both Parties appealed to the Ninth Circuit and both appeals were dismissed for lack of appellate jurisdiction. *See* Dkts. 188, 189.

In the midst of this dispute, Plaintiffs moved to certify a class under Fed. R. Civ. P. 23(b)(2) and to preliminarily enjoin the sale of virtual chips in Big Fish's games. *See* Dkt. 176. On March 4, 2020, prior to Defendants' response date, Judge Leighton denied Plaintiffs' motion without prejudice, spelling out a clear roadmap for the next steps in the litigation: Defendants' renewed arbitration and personal jurisdiction motions would come first, and in the meantime, the Parties would cooperate on a stipulated briefing schedule, ESI Protocol, Protective Order, and limited discovery. *See* Dkt. 185.

The Parties fought tooth and nail on each point. They could not reach agreement on a briefing schedule and proposed competing schedules to the Court. *See* Dkt. 186; Dkt. 187. They could not reach agreement on an ESI Protocol and Protective Order, so Plaintiffs moved for entry of the District's model orders. *See* Dkt. 192. And they could not agree on the scope of discovery ahead of the renewed motions, so Plaintiffs moved to compel outstanding jurisdictional discovery requests. *See* Dkt. 191. Ultimately, the Court entered Defendants' briefing schedule and granted both of Plaintiffs' contested motions, ordering Defendants to produce a bevy of internal documents and communications. *See id.*; Dkt. 213. On April 10, 2020, Defendants filed their renewed arbitration and jurisdiction motions, which the Parties fully briefed. *See* Dkt. 205. It was at this point that the Parties agreed to attempt to resolve these cases through mediation.

Settlement talks began in earnest in April 2020. The Parties agreed to schedule a mediation session on May 22, 2020 with Judge Layn Phillips (ret.). *See* Dkt. 218 ¶ 12. From that point forward, over the next several weeks, the Parties were in near-daily communication with the Phillips ADR team and each other, as the Parties sought to crystallize the disputed issues, produce focal information and data, and narrow down potential frameworks for resolution. *Id.* 218 ¶ 13. During this period, Defendants provided Plaintiffs with several sets of detailed

1   transactional data, the Parties exchanged more than fifty (50) pages of briefing on the core facts,

2   legal issues, litigation risks, and potential settlement structures, and the Parties supplemented that

3   briefing with extensive written and telephonic correspondence, mediated by the Phillips ADR

4   team, clarifying each other's positions in advance of the mediation. *See id.*

5          On May 22, 2020, the Parties participated in a full-day (indeed, more than twelve-hour-

6   long) video-mediation. *See id.* ¶ 14. Following several rounds of arms-length negotiations

7   facilitated by Judge Phillips, the Parties agreed to a settlement in principle, which was

8   memorialized in the form of a binding term sheet. *See id.*; Dkt. 214. But the negotiations didn't

9   end there: over the next two months, the Parties worked out the details of a fulsome final

10  settlement agreement, exchanged several rounds of a working settlement document and

11  supporting exhibits, met and conferred telephonically to flesh out the remaining disputed

12  provisions, and together met and conferred with Apple Inc., Google LLC, and Facebook, Inc.

13  (collectively, the "Platform Providers") to help design a robust Notice Plan. *See* Dkt. 218 ¶ 16.

14  On July 23, 2020, the Parties executed the Settlement Agreement before the Court. *See id.* ¶ 29.

15  **IV.   Class Counsel's Litigation-Adjacent Efforts On Behalf Of The Class.**

16         As a necessary extension of the traditional litigation work necessitated by these cases,

17  Class Counsel has for years undertaken all manner of litigation-adjacent work for the benefit of

18  the Class. These efforts are organized into three categories and summarized below.

19         *First*, Class Counsel went to great lengths to protect this litigation from collateral

20  administrative attacks. Just two weeks after the Ninth Circuit's mandate issued in *Kater*, Big Fish

21  dispatched its Covington & Burling lawyers—*i.e.*, the same lawyers defending *Kater*—to the

22  WSGC's session in Tacoma to present a "Petition for a Declaratory Order" asking the

23  Commission to declare that Big Fish's games "do[] not constitute gambling within the meaning

24  of the Washington Gambling Act, RCW 9.46.0237." Dkt. 79-5 at 1. At each of the three public

25  hearings that followed—in July 2018 (in Tacoma), August 2018 (in Pasco), and October 2018 (in

26  Olympia)—Class Counsel appeared before the Commission, and Class Counsel presented live

27  argument at both the Tacoma and Pasco hearings. *See* Logan Decl. ¶ 10. Class Counsel

---

Motion for Award of Attorneys' Fees & Expenses
CASE NOS. 15-CV-612 & 19-CV-199 - 8

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

supplemented these appearances with a formal letter to the Commission (ahead of the Tacoma

hearing) and, on the Commission's request, with an eighteen-page comment for the

Commission's consideration (between the Tacoma and Pasco hearings). *Id.* The WSGC

ultimately declined to enter a Declaratory Order. *See* Dkt. 74-1. And even after the initial

declaratory order proceedings, Class Counsel continued to represent the interests of the Class in

additional flare-ups before the WSGC, including in similar declaratory order proceedings

initiated by The Stars Group. *See* Logan Decl. ¶ 11.

     *Second*, Class Counsel has been the frontline opposition to Defendants' attempt to change

Washington's gambling laws. Starting in early 2019, the International Social Gaming

Association ("ISGA") provided legislators draft legislation that would amend Washington's

gambling statutes with the effect (and specific intent) of gutting these lawsuits. *See id.* ¶ 12. Over

time, these efforts gained steam, with Senators Mark Mullet and John Braun, as well as

Representatives Zack Hudgins, Brandon Vick, Bill Jenkin and Brian Blake, collectively

sponsoring four (4) bills threatening to kill these cases by "clarifying" that players who lose

money playing social casinos cannot recover under the RMLGA. H.B. 2720, 66th Leg., Reg.

Sess. (Wash. 2020); S.B. 6568, 66th Leg., Reg. Sess. (Wash. 2020); H.B. 2041, 66th Leg., Reg

Sess. (Wash. 2019); S.B. 5886, 66th Leg., Reg. Sess. (Wash. 2019). Local and national media

covered these efforts and left no doubt as to what the ISGA hoped to accomplish. *See, e.g.*,

Phillip Conneller, *Washington State Social Gaming Legislation Could Rescue Big Fish Casino

From Legal Trouble*, CASINO.ORG (Jan. 29, 2020), *available at* https://bit.ly/39dKtWM.

     In response, Class Counsel engaged the lobbying firm Peggen & Mara Political

Consulting LLP—experts in Washington tribal and gambling laws—to help Class Counsel (i)

stay on top of all administrative and legislative developments in the Washington gaming

industry; (ii) understand the intricacies of Washington's specific legislative process, including

the nuances of—and procedures for—bill drafting; (iii) understand who the relevant lawmakers

and stakeholders in Washington's gaming industry were, what those lawmakers and stakeholders

cared about, and how Class Counsel could educate those lawmakers and stakeholders about

1    social casinos; and (iv) work with legislative groups, task forces, and other interested parties in

2    in Washington's gaming industry, including the Washington Indian Gaming Association

3    ("WIGA"). Logan Decl. ¶ 13.

4          Class Counsel then used this information and expertise to amplify the Class's interests

5    and concerns. Class Counsel drafted memos and prepared handouts for a variety of stakeholders,

6    including State Senators and Representatives, the WIGA, the Washington Trial Attorneys'

7    Association, the Public Interest Research Group, and other organizations dedicated to remedying

8    problem gambling. *Id.* ¶ 14.

9          Class Counsel also personally met with lawmakers in the Washington Senate and House,

10   met with officials in the Executive branch, and provided in-person testimony to the Washington

11   Legislature. *Id.* ¶ 15. For example, in January 2019—after Class Counsel got wind that

12   Defendants and the ISGA were planning to gut Washington's gambling statutes (in what would

13   become the failed H.B. 2041 and S.B. 5886)—Class Counsel met in-person with Representative

14   Shelley Kloba, then-Representative (and now Senator) Derek Stanford, Lieutenant Governor

15   Cyrus Habib, and several other government officials. *Id.* ¶ 16. On January 28, 2020, Class

16   Counsel met with Senator Stanford at the State Capital—following Class Counsel's written and

17   in-person testimony before the House Civil Rights & Judiciary Committee in (successful)

18   opposition to H.B. 2720. *Id.* ¶ 17.

19         Class Counsel's efforts went beyond in-person testimony and meetings with legislative

20   and executive officials. On March 21, 2019, Class Counsel sent formal correspondence to

21   Senator Mark Mullet ahead of a planned work session before the Senate and Financial

22   Institutions, Economic and Trade Committee about the *Kater* matter—in which Defendants

23   Aristocrat and Big Fish Games had been invited, but Class Counsel had not. *Id.* ¶ 18. In August

24   2019, Class Counsel traveled to Anacortes—on Swinomish Tribe land—to speak at a monthly

25   WIGA meeting, in opposition to the ISGA-backed bills. *Id.* ¶ 19. And in early 2020, Class

26   Counsel coordinated the submission of more than 200 letters to Washington State

27   Representatives from Big Fish Casino players across the country and spoke with local press

1   about the ISGA's renewed efforts to gut these lawsuits. *See id.* ¶ 20; *see also* Melissa Santos,

2   *'Free' casino apps prey on addiction, users say, and WA lawmakers are considering a*

3   *crackdown*, CROSSCUT (Feb. 7, 2020), *available at* https://bit.ly/3hfFxDl. These efforts held the

4   line. Each bill introduced over the past two years has stalled.

5        *Third*, beyond Class Counsel's work on legislative and administrative fronts, Class

6   Counsel also helped its clients sound the alarm on social casinos to the public at large by helping

7   clients share their stories with local and national media, including in the following pieces:

8

9       • *Harpooned by Facebook*, REVEAL-CENTER FOR INVESTIGATIVE REPORTING (Aug. 3, 2019), *available at* https://bit.ly/39NIdri (featuring radio interview with Class Representative Suzie Kelly)

10

11      • *How social casinos leverage Facebook user data to target vulnerable gamblers*, PBS NEWSHOUR (Aug. 13, 2019), *available at* https://to.pbs.org/3lPRd1m

12        (featuring television interview with Class Representative Suzie Kelly)

13      • Melissa Santos, *'Free' casino apps prey on addiction, users say, and WA lawmakers are considering a crackdown*, CROSSCUT (Feb. 7, 2020), *available at*

14        https://bit.ly/3hfFxDl (featuring Class Representative Suzie Kelly, Class Member Jill Interrante, and Class Counsel Alexander Tievsky)

15

16      • *Addicted to losing: How casino-like apps have drained people of millions*, NBC NEWS (Sept. 14, 2020), *available at* https://nbcnews.to/39Lo1X1 (featuring

17        interviews with Class Members).

18   **V.**    **The Settlement Now Before The Court.**

19        Following all of these efforts, and with the assistance of the Judge Phillips, Class Counsel

20   reached a settlement with Defendants that provides a non-reversionary cash recovery of $155

21   million from which every class member who has ever lost money playing Defendants' social

22   casino games is entitled to recover a substantial portion of their losses back. *See* Dkt. 218-1

23   § 1.32. Class members with higher levels of losses are entitled to recover increasingly higher

24   percentages of their losses, and the upper echelons of "VIP" players stand to recover more than

25   half of their losses. *See id.* §§ 1.36, 2.1(c). The Settlement also requires Defendants to implement

26   meaningful prospective relief, including by providing addiction-related resources within their

27

1    social casino games and by creating and honoring a self-exclusion policy akin to what one might

2    expect to soon see at the Emerald Queen or the Muckleshoot casinos. *See id.* § 2.2.

3                                            **ARGUMENT**

4           Class Counsel seek an award of 25% of the $155 million, all-cash, non-reversionary

5    common fund they have secured for the Class. In addition, Class Counsel seek reimbursement of

6    their reasonably-incurred costs and expenses. In evaluating these requests, the Court must

7    "assume the role of fiduciary for the class plaintiffs" and "[r]ubber-stamp approval, even in the

8    absence of objections, is improper." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir.

9    2002). The Court's scrutiny is welcome here. A close look at the fee request, particularly in the

10   context of the analyses provided by two leading scholars on class action fee awards,

11   demonstrates that the requested fee is reasonable given the outstanding result and the high degree

12   of risk faced by counsel. Similarly, Class Counsel's expenses—including more than $1.5 million

13   on the Court-ordered notice program in 2020 alone—were necessary to prosecute this nationwide

14   class action and consequently should be reimbursed.

15   **I.      The Court Should Award Class Counsel 25% Of The $155 Million Common Fund.**

16          Because Washington law governs the claims in this case, it also governs the award of

17   fees. *Id.* at 1047. Under Washington law, the percentage-of-recovery approach is generally used

18   to calculate fees in common fund cases, and 25% is considered the "benchmark" with 20%-30%

19   the usual range. *Bowles v. Dep't of Ret. Sys.*, 121 Wash.2d 52, 72, 847 P.2d 440 (1993)

20   (observing that the lodestar method is generally reserved for statutory fee cases); *see also*

21   *Vizcaino v. Microsoft Corp.*, 142 F. Supp. 2d 1299, 1302 (W.D. Wash. 2001), *aff'd*, 290 F.3d

22   1043 (9th Cir. 2002) ("The Washington Supreme Court rejected the lodestar method for

23   determining attorneys fees in a common fund action.").

24          Washington courts look to federal law for guidance on determining an appropriate fee

25   percentage, *see, e.g.*, *id.*, and the Ninth Circuit considers 25% the "benchmark" fee award in

26   common fund cases, *Vizcaino*, 290 F.3d at 1047. When Ninth Circuit courts consider a request

27   for attorneys' fees based on the percentage method, they typically consider some combination of

1   the following non-exhaustive list of factors: "(1) the extent to which class counsel achieved

2   exceptional results for the class; (2) whether the case was risky for class counsel; (3) whether

3   counsel's performance generated benefits beyond the cash settlement fund; (4) the market rate

4   for the particular field of law; (5) the burdens class counsel experienced while litigating the case;

5   (6) and whether the case was handled on a contingency basis." *In re Optical Disk Drive Prods.*

6   *Antitrust Litig.*, 959 F.3d 922, 930 (9th Cir. 2020).

7        The Ninth Circuit has also noted that in cases—like this one—where the settlement fund

8   is very large, the Court should ensure that the fee awarded is based on the results achieved by

9   class counsel, and not simply a windfall created by economies of scale. *See id.* That said, the

10  Ninth Circuit has explicitly declined to require a "sliding-scale" analysis in so-called

11  "megafund" cases. *See id.* Indeed, in *Vizcaino*—the leading Ninth Circuit case on fees, and itself

12  a megafund case—the Ninth Circuit affirmed the district court's fee award of 28% of the

13  common fund. *Vizcaino*, 290 F.3d at 1050.

14       Here, Class Counsel request a fee award of $38,750,000, or 25% of the Settlement Fund,

15  in addition to reimbursement of their reasonably-incurred expenses. This percentage would

16  properly compensate Class Counsel for achieving an exceptional result in extraordinarily risky,

17  novel litigation. And while the Settlement Fund is concededly large, the requested fee award

18  would, under the circumstances, not provide a windfall.

19       **A.    Class Counsel Obtained an Unprecedented Result for the Class.**

20       When determining an award of attorneys' fees in a class action, "[t]he most important

21  factor is the results achieved for the class." *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-*

22  *in-Aid Cap Antitrust Litig.*, No. 4:14-MD-2541-CW, 2017 WL 6040065, at *3 (N.D. Cal. Dec. 6,

23  2017), *aff'd,* 768 F. App'x 651 (9th Cir. 2019). Typically, courts "aim to tether the value of an

24  attorneys' fees award to the value of the class recovery." *In re HP Inkjet Printer Litig.*, 716 F.3d

25  1173, 1178 (9th Cir. 2013). In a common fund case in which class counsel seek an award as a

26  percentage of the fund, "this task is fairly effortless. The district court can assess the relative

27  value of the attorneys' fees and the class relief simply by comparing the amount of cash paid to

the attorneys with the amount of cash paid to the class. The more valuable the class recovery, the greater the fees award." *Id.*

Here, the result is unprecedented. Though the social casino industry has been a multi-billion dollar business for the better part of a decade, no social casino company has ever before paid to settle class allegations that social casino games are illegal gambling. Yet here, far from paying nothing or nuisance value, Defendants have agreed to pay $155,000,000, in cash, to settle the Settlement Class' claims. Even at the top end of the Settlement Administrator's projected claims rate ranges, participating Class Members stand to recover substantial portions of their losses to the Applications, with Settlement Class Members in the highest category of Lifetime Spending Amounts slated to recover the majority—*i.e.*, more than half—of their losses. *See* Declaration of Steven Weisbrot, Dkt. 219 ¶¶ 50-53. By way of example, Class Representatives Thimmegowda, Kater, and Kelly, who estimate their losses at approximately $4,000, $40,000, and $400,000, are projected to recover $500-$1,000 (Thimmegowda), $10,000-$20,000 (Kater), and $200,000-$300,000 (Kelly). *Id.* For thousands of Class Members, credit card debts will be wiped out; home equity lines of credit will be paid off; and in the midst of an economic crisis, five- and six-figure debts accumulated from playing Defendants' games will be erased overnight.

It is difficult to overstate what a triumph this settlement is for the Settlement Class, particularly given the federal judiciary's initial reception to these cases and the fact that no defendant has ever before paid a penny to settle class action claims pertaining to social casinos. Professor Rubenstein describes the recovery, under the circumstances, as an "astounding accomplishment" and calls the relief provided "historic." Rubenstein Decl. ¶¶ 1, 3. It is also difficult to compare this settlement to other settlements, given that it has no true peers to be reasonably measured against. On the facts, the closest comparator is almost certainly *In re Apple In-App Purchase Litigation,* in which the class alleged that certain apps offered within Apple's App Store were "highly addictive, designed deliberately so, and tend to compel children playing them to purchase large quantities" of in-game currency, "amounting to as much as $100 *per purchase* or more." No. 5:11-CV-01758 EJD, 2013 WL 1856713, at *1 (N.D. Cal. May 2, 2013)

1   (emphasis added). But there, the settlement established no common fund at all, the default

2   recovery for participating class members was five dollars (yes, $5), and with adequate proof

3   some claiming class members could claim refunds for a single 45-day period of purchases. *Id.* at

4   *5. Similarly, in *Kim v. Tinder, Inc.*, the class alleged unfair pricing with regard to in-app

5   purchases in a popular dating app. No. CV 18-3093-JFW(ASX), 2019 WL 2576367, at *2 (C.D.

6   Cal. June 19, 2019). The settlement established no common fund at all, and participating class

7   members received 50 free "Super Likes" (*i.e.*, coupons) in addition to an option to select a $25

8   cash payment (as an alternative to other coupon offers). *Id.* Without meaning to punch down,

9   there is just no comparison between the settlements that have ever previously been reached in

10  factually-similar cases and the settlement currently before the Court.

11          Perhaps the better measuring stick for this settlement are class action settlements in the

12  consumer privacy space, given that those settlements often resolve large (statutory) damages

13  claims and are premised on novel interpretations of law as applied to allegations of internet-

14  based misconduct. Consumer privacy settlements, too, are notorious for failing to provide

15  consumers with real-world relief for the damages they have suffered. For example, in *In re*

16  *Google Referrer Header Privacy Litig.*, 869 F.3d 737, 740 (9th Cir. 2017), *vacated on other*

17  *grounds by Frank v. Gaos*, 139 S. Ct. 1041 (2019), the Ninth Circuit affirmed a 25% award of

18  attorneys' fees in a case where consumers did not see a single penny. All of the money was to go

19  to *cy pres*, with no cash relief for the class at all. *Gaos*, 139 S. Ct. at 1045.

20          And even in consumer privacy settlements that do provide monetary relief and have been

21  adjudged to be fair and reasonable by district courts, the relief is often primarily in-kind and the

22  monetary relief is often far less than what has been made available here. *See, e.g.*, *In re Anthem,*

23  *Inc. Data Breach Litig.*, 327 F.R.D. 299, 324 (N.D. Cal. 2018) (explaining that only $13 million

24  of the $115 million "fund" was available for cash payments, with the rest being reserved to

25  purchase credit monitoring services); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No.

26  16-MD-02752-LHK, 2020 WL 4212811, at *22 (N.D. Cal. July 22, 2020) ($117.5 million made

27  available to class of more than 194,000,000 individuals [*i.e.*, nearly two-third of the United

States]; cash relief made available only to class members with existing credit monitoring, out-of-pocket losses, and who paid Yahoo! for premium services).

Given that the benefits of the Settlement far outshine those in any other remotely comparable class action settlement, Class Counsel respectfully submits that it is reasonable to award a benchmark fee of 25% of the Settlement Fund. *Cf. HP*, 716 F.3d at 1178 (discussing the benefits of tying counsel's compensation to class members' recovery). And as discussed further below, even in comparison to other so-called "megafunds," the results achieved here are extraordinary, and the requested fee is in line with what courts regularly award in Washington, in the Ninth Circuit, and nationwide. *See* Rubenstein Decl. ¶ 17; *accord* Declaration of Professor Charles Silver ("Silver Decl.") ¶¶ 71-72. Consequently, Plaintiffs respectfully submit that awarding 25% of the common fund is appropriate, and that there is no reason for a downward departure from the requested "benchmark" award.

### B.  Class Counsel's Efforts Generated Non-Monetary Benefits.

The monetary component of this Settlement is the chief relief made available to the Settlement Class, and it is the only component of the Settlement that Class Counsel ask to be compensated for directly. That said, the non-monetary benefits that Class Counsel achieved for the Class in this groundbreaking litigation are significant, and they further justify the appropriateness of the requested fee award here.

First, and most obviously, there is the prospective relief that Big Fish agreed to. The Settlement requires Big Fish to implement meaningful prospective relief, including by providing addiction-related resources within its social casino games and by creating and honoring a meaningful self-exclusion policy. *See* Agreement § 2.2. Given the fervor with which Defendants have long insisted that their games are not gambling, these in-game changes are a monumental achievement for the Settlement Class. They represent the first steps toward much-needed self-regulation within the social casino industry and given Big Fish's prominence in the social casino industry, other industry players have and will continue to follow suit.

On top of the benefits set out in the Settlement, Class Counsel's efforts in this litigation

have undoubtedly resulted in Class members being protected more generally. *See* Rubenstein
Decl. ¶ 26 ("Class Counsel's achievement transcends these particular settlements by making a
contribution to the general public health of the United States."). This litigation created strong
precedent that will protect Class members in the future, not just with regard to Big Fish Casino
but more broadly with regard to business practices in the social casino industry. For example,
this case revealed to the public the practice of social casino companies assigning "VIP hosts" to
clearly-addicted players as a means of extracting as much revenue as possible out of those
addicts. *See* Dkt. 176 at 6 ("When I would ask Big Fish Casino to ban my account, or ban my
credit card, or say that I thought I needed to take a break from playing because of how much
money I was spending, Byron [Scott] would tell me how much he and the other VIP hosts would
miss me, and that they would be sad to see me go."). Class Counsel understands that as a result
of this lawsuit, Big Fish has substantially altered its VIP program and is no longer using VIP
hosts to prey on gambling addicts. Logan Decl. ¶ 22. Indeed, "Byron Scott" recently left Big
Fish. *See id.* ¶ 23. So, too, did the head of Big Fish's VIP Program. *See id.* ¶ 24. And the month
before this settlement was announced, Big Fish's Managing Director & President resigned from
the company. *See id.* ¶ 25. Class Counsel respectfully submit that these are not mere
coincidences. Moreover, the Court can safely presume that other social casino companies have
taken note of Big Fish's reforms and have begun following suit so as to avoid litigation over
similar business practices in the future.

   This litigation also spawned legislative and regulatory efforts, backed by well-funded
industry groups including the ISGA, to defang Washington's gambling laws. *See* Logan Decl.
¶ 12. Had Class Counsel ignored these efforts, a change to Washington's gambling laws could
have caused consumers to lose any opportunity to recover in this litigation as well as leaving
them unprotected more generally. Instead, Class Counsel deployed significant resources in
Olympia and elsewhere to educate legislators on the social casino industry, to coordinate efforts
by other interested parties, and to generally ensure that Class members' voices were heard. *See
id.* ¶ 10. Absent these efforts, the loudest voices in Olympia and before the Gambling

1  Commission would have been the lawyers and lobbyists paid for by Defendants and the trade

2  organizations they helped bankroll. Simply put, Class Counsel's legislative and regulatory efforts

3  were an integral part of successfully prosecuting this case, and Class Counsel's success in these

4  areas created enormous benefits for the Class. *See id.*

5      Finally, it bears mentioning that this settlement served as a catalyst for at least two

6  additional settlements, totaling another $44.5 million in gambling losses being returned to

7  consumers, in the *Wilson v. Huuuge* and *Wilson v. Playtika* cases. Many of the Class Members in

8  this action are class members in those cases. *See id.* ¶ 25. In other words, this settlement served

9  as a catalyst for many Class Members to obtain monetary and non-monetary benefits in *at least*

10  two other lawsuits. So while the Court should consider the additional attorneys' fees requests in

11  those cases in conjunction with its consideration of the fee requested in this case, *see In re*

12  *Optical Disk Drive*, 959 F.3d at 933, it should also consider that: (i) this case conferred

13  substantial benefits upon many class members outside the confines of this specific settlement,

14  and (ii) unlike in *Optical Disk Drive*, Class Counsel was not merely handed a leadership seat in a

15  run-of-the-mill antitrust case and then allowed to harvest repeated fee awards, but instead

16  litigated a *de facto* MDL, on its own accord and because of its perseverance helped many

17  individual class members obtain multiple recoveries across multiple lawsuits.

18      **C.    Pursuing this Litigation on a Contingent Basis Was Extremely Risky**
**for Class Counsel.**
19

20      In determining the appropriateness of a fee award, the next step is to consider the flip side

21  of the results—risk. That is, the amount of the fee depends in part on whether, and to what

22  degree, "class counsel ran the risk of not being paid at all." *Steiner v. Am. Broad. Co.*, 248 F.

23  App'x 780, 782 & n.2 (9th Cir. 2007). Here, Class Counsel worked entirely on contingency,

24  advancing both their time and more than $1.75 million in required costs and expenses. Logan

25  Decl. ¶ 26. If Defendants had won this case, through any number of avenues, Class Counsel

26  would not have been compensated at all.

27      While that risk exists in all contingency litigation, it was substantially more acute here

1  than in other cases. *Vizcaino*, 290 F.3d at 1048, illustrates that point well. *See* Rubenstein Decl. ¶

2  24 ("Eleven independent factors demonstrate the riskiness of these cases. . . ."). In *Vizcaino*, one

3  of the leading Ninth Circuit cases on awarding attorneys' fees in common fund class action

4  settlements, the Ninth Circuit approved the district court's characterization of the case as

5  "extremely risky[.]" The district court arrived at that conclusion because:

> 6  [T]here were no controlling precedents concerning their claims, only
> analogies involving various areas of law. In addition, Class Counsel's risk
> 7  was even greater, and their work made more difficult, because Microsoft is
> one of the nation's largest and most formidable companies and it, and
> 8  several law firms, defended the case vigorously for several years.

9  *Vizcaino*, 142 F. Supp. 2d at 1303.

10  Here, Class Counsel found themselves in much the same situation. Unlike other statutes

11  that commonly form the basis for class actions (*e.g.*, the Telephone Consumer Protection Act;

12  the Fair Credit Reporting Act; the Fair Debt Collections Practices Act; etc.), Washington's

13  "Return of Money Lost at Gambling" statute had not been heavily litigated when this case was

14  filed in 2015. In fact, to Class Counsel's knowledge, prior to *Kater*, no class action had ever

15  before alleged claims for recovery under the RMGLA. Logan Decl. ¶ 27. Certainly, no class

16  action had ever before alleged claims under the RMLGA against social casino companies. *Id.*

17  That means that all the elements of Plaintiffs' claims were matters of first impression. The

18  factual landscape was similarly undeveloped. While some class actions follow on the heels of a

19  government enforcement action in which a public agency has already identified and investigated

20  a problem, this one did not. *See* Rubenstein Decl. ¶ 24 ("These cases were risky because they did

21  not piggy-back on a government enforcement action . . . [here] Class Counsel detected,

22  investigated, theorized, and executed the entire litigation campaign from scratch"). In fact, one

23  of the principal defenses that Big Fish advanced throughout this litigation was that the WSGC had

24  purportedly endorsed social casinos. *See, e.g.*, *Kater*, No. 3:15-CV-612-RBL, 2018 WL

25  5734656, at *5 (W.D. Wash. Nov. 2, 2018); *Kater*, No. C15-612 MJP, 2015 WL 9839755, at *2

26  (W.D. Wash. Nov. 19, 2015).

27  These risks were not merely hypothetical. In fact, five federal district courts initially

1   presented with Class Counsel's novel theory of these cases rejected it—some emphatically so. A

2   synopsis of those setbacks, which Class Counsel nevertheless persevered through, follows below.

   1.  ***Mason v. Mach. Zone, Inc.*, No. 15-cv-01107 (D. Md.).** In this District of
       Maryland case, the plaintiff alleged that a virtual slot machine in a video game
       violated California and Illinois gambling laws. On October 20, 2015, the district
       court dismissed the case with prejudice, calling Plaintiff's complaint "a
       hodgepodge of hollow claims lacking allegations of real-world harms or injuries."
       *Mason*, 140 F. Supp. 3d 457, 459 (D. Md. 2015). In March 2017, after briefing
       and oral argument, the Fourth Circuit affirmed. *See Mason*, 851 F.3d at 316.

   2.  ***Kater v. Churchill Downs Inc.*, No. 15-cv-612 (W.D. Wash.).** *Kater* was filed in
       this District and raised claims that "Big Fish Casino" violated Washington's
       gambling laws. Plaintiff's core theory was that because users wagered virtual
       chips on virtual slot machines, those virtual chips were "things of value" that
       extended the privilege of continued gameplay. On November 19, 2015, the
       Honorable Marsha J. Pechman dismissed Kater's claims with prejudice. Judge
       Pechman reasoned that Big Fish Casino could not constitute illegal gambling in
       Washington because, *inter alia*, "there is never a possibility of receiving real cash
       or merchandise, no matter how many chips a user wins." *Kater*, 2015 WL
       9839755, at *3.

   3.  ***Dupee v. Playtika Santa Monica, et al.* No. 15-cv-01021 (N.D. Ohio).** In this
       Northern District of Ohio case, the plaintiff alleged that Slotomania violated Ohio
       and Nevada gambling laws. On March 1, 2016, the district court dismissed. *See
       Dupee*, 2016 WL 795857, at *1.

   4.  ***Phillips v. Double Down Interactive LLC,* No. 15-cv-04301 (N.D. Ill.).** In this
       Northern District of Illinois case, the plaintiff claimed DoubleDown Casino
       violated Illinois gambling laws. On March 25, 2016, the court dismissed. *Phillips*,
       173 F. Supp. 3d at 739.

   5.  ***Ristic v. Mach. Zone, Inc.* No. 15-cv-08996 (N.D. Ill.).** In this Northern District
       of Illinois case, the plaintiff alleged that the virtual slot machine in the videogame
       violated Illinois law. On September 19, 2016, the court dismissed, finding that,
       "while any type of addiction is unfortunate, this court . . . does not read [Illinois
       law] to protect [the plaintiff] from his own decision to play the Casino." *Ristic*,
       2016 WL 4987943, at *4.

22      And even after the Ninth Circuit reversed the dismissal in *Kater*, these were

23   extraordinarily risky cases. Like in *Vizcaino*, the Defendants here were extraordinarily well-

24   funded. The combined market capitalization of Churchill Downs and Aristocrat is more than $20

25   billion. Logan Decl. ¶ 28. Having effectively unlimited resources, Defendants were defended

26   primarily by Covington & Burling, Orrick, and Susman & Godfrey, three of the country's most

27   expensive and prestigious law firms (with a fourth firm, Gibson Dunn, added at the appellate *en*

1   *banc* stage), who together—like Microsoft's counsel in *Vizcaino*, defended this case with vigor.

2   That vigor expanded beyond standard litigation tactics. As just one example, in October 2019

3   Big Fish launched a pop-up in its games that—if clicked—purported to bind its players to the

4   "Dispute Resolution Provision," requiring them to arbitrate any claims against Defendants and to

5   cut the relevant statutes of limitations. Dkt. 218 ¶ 3. As Professor Rubenstein explains:

6
7   > [N]ot only did Class Counsel fight these cases in courts across the country,
   > but as they did, proponents of these games attempted to . . . cram down new
   > non-litigation dispute resolution rules on game users mid-case, and change
8  > existing gambling laws and regulations; these actions forced Class Counsel
   > to defend their efforts in multiple arenas simultaneously, lest the entire
9  > endeavor be lost. Class Counsel shouldered all of this risk while litigating
   > against large and rich corporations, 3 with seemingly bottomless coffers,
10 > yet they did so in a lean fashion without enlisting dozens of law firms to
   > share the risk.
11

12  Rubenstein Decl. ¶ 1.

13      Returning to *Vizcaino*, in that case Microsoft's powerful lobbying presence in

14  Washington would not legitimately have been able to affect its liability to the class because the

15  claims alleged were common-law contact claims. Here, on the other hand, Defendants and

16  industry groups like the ISGA used their lobbying influence in Olympia to attempt to gut the

17  RMLGA and end these cases almost before they got off the ground. Logan Decl. ¶ 12.

18  Defendants and the ISGA likewise repeatedly attempted to convince the WSGC to issue a

19  "Declaratory Order" effectively immunizing Defendants from any liability in this litigation. *Id.*

20  ¶ 10; Class Counsel's quick organizing efforts and personal visits to Olympia and various

21  locations for Commission hearings avoided that outcome, but it was—and remains—an

22  extremely serious risk. Indeed, at least once during the pendency of this litigation, industry

23  groups in another state successfully pressured state legislators to amend a gambling statute to

24  immunize social casino companies. *See* Maine H.P. 35 – L.D. 34, 2019.

25      In sum, this case involved bringing claims under an untested statute against multi-billion

26  dollar gambling conglomerates, who then proceeded to challenge nearly every issue in nearly

27  every available forum. The risk of nonpayment here was extreme, and that should factor heavily

1  in the Court's determination of a reasonable fee.

2  **D.    The Market Supports the Requested Fee.**

3  Although the Ninth Circuit has not adopted the full market-mimicking approach of other

4  circuits, "the market rate for the particular field of law" is still an important consideration.

5  *Optical Disk Drive*, 959 F.3d at 930. Here, a market-based analysis supports both the

6  reasonableness of using the percentage method to calculate the fee in this case and the specific

7  percentage Class Counsel requests.

8  As Professor Charles Silver explains, the market for high-stakes, high-value, plaintiff's-

9  side litigators is entirely driven by a percentage-of-the-recovery model. Silver Decl. ¶ 42-58.

10  That is true across all kinds of plaintiff's firms, all kinds of litigation, and all kinds of claims. *Id.*

11  Empirical studies of fee arrangements in these cases demonstrate that sophisticated clients almost

12  always pick to incentivize their lawyers by agreeing to a fixed percentage of between 30% and

13  40% of the recovery. *Id.* The relevant market comparison for the fee in this case, therefore, is the

14  percentage of recovery.

15  In terms of the specific amount requested here, the private market would easily support a

16  fee higher than the 25% that Class Counsel request. The Ninth Circuit has questioned the market-

17  based approach where the sole point of comparison is other judicially approved fees. *See*

18  *Vizcaino*, 290 F.3d at 1049. Accordingly, a good starting point for the market comparison is

19  "commercial litigation where the fee is determined by application of the negotiated contingency

20  percentage to the amount of the recovery." *Id.* Although no such market truly exists for class

21  actions, *see id.*, there are meaningful comparisons to be had in other areas of law. For example,

22  sophisticated business clients who serve as named plaintiffs in class actions commonly agree to

23  pay fees of 33 percent or greater to their counsel. *See* Silver Decl. ¶ 52. Similar rates prevail in

24  antitrust class actions in which businesses participate as plaintiffs. *Id.* ¶ 53. Ditto pharmaceutical

25  cases, where a 33% fee award "heavily dominate[s]" market. *Id.* ¶ 54. And in patent cases, where

26  plaintiffs "have the option of paying lawyers to represent them on an hourly basis," they almost

27  always "still prefer a contingency arrangement, even at 30-40 percent, to bearing the risks and

1    costs of litigation themselves." *Id.* ¶ 58.

2         The reason for this is straightforward. As the Ninth Circuit has explained, the goal of

3    setting a fee award is to "ensure faithful representation by tying together the interests of class

4    members and class counsel." *HP*, 716 F.3d at 1178. A system where class counsel is paid *less* for

5    recovering more money has exactly the opposite effect, and application of the "megafund"

6    principle without careful, case-specific analysis can create very poor incentives. *See, e.g.*, *In re*

7    *Synthroid Mktg. Litig.*, 264 F.3d 712, 721 (7th Cir. 2001) (noting that use of declining marginal

8    percentages under the megafund principle leads to "declining marginal returns to legal work,

9    ensuring that at some point attorneys' opportunity cost will exceed the benefits of pushing for a

10   larger recovery, even though extra work could benefit the client.")

11        Comparison to judicially approved fees can also be useful, and that comparison supports

12   Class Counsel's request here as well. Unsurprisingly, given the Ninth Circuit's benchmark, the

13   mean percentage award of attorneys' fees in class actions in the Ninth Circuit is 24.5% of the

14   fund and the mean percentage awarded in the Western District of Washington is 26.98%. *See*

15   Rubenstein Decl. ¶ 14. Even for megafund cases, Courts have often awarded fee percentages

16   greater than the percentage requested by Class Counsel here. Silver Decl. ¶¶ 70-73 & Table 1;

17   Rubenstein Decl. ¶ 16 & Graph 1.

18        Class Counsel's request for 25% of the Settlement Fund falls below the relevant market

19   rate. A market analysis therefore supports the requested award here.

20        **E.    The Court Should Not Conduct a Lodestar Cross-Check.**

21        Class Counsel respectfully submit that consideration of lodestar in this case would not

22   accurately account for the efforts Class Counsel contributed toward the settlement it obtained for

23   the Class, would not guard against a windfall, and would create perverse incentives for future

24   class actions with regard to efficiency. For that reason, the Court should not—and certainly need

25   not—conduct a lodestar cross-check. *See* Rubenstein Decl. ¶ 28 ("A lodestar cross-check is not a

26   helpful tool by which to assess the reasonableness of counsel's proposed percentage award in the

27   unique circumstances presented by these interrelated cases."); *accord* Silver Decl. ¶¶ 74-78.

1    It is true that some Ninth Circuit panels have encouraged district courts to employ a

2    lodestar cross-check when using the percentage method to award fees based on a common fund.

3    *See Farrell v. Bank of America Corp.*, 827 F. App'x 628, 635 (9th Cir. 2020). But to be clear, it

4    is "settled" law that the Ninth Circuit *does not* require a lodestar cross-check. *Id.* at 630; *accord*

5    *Campbell v. Facebook*, 951 F.3d 1106, 1126 (9th Cir. 2020); *In re Hyundai & Fuel Econ. Litig.*,

6    926 F.3d 539, 571 (9th Cir. 2019) (*en banc*); *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d

7    935, 944 (9th Cir. 2011); *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 738-39 (9th Cir.

8    2016); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998); *Six (6) Mexican Workers*

9    *v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

10    Rather, a district court may appropriately determine that the circumstances of a given

11    case warrant a certain percentage of a fund—particularly if that percentage is around the 25%

12    benchmark—without considering class counsel's lodestar. *See Farrell*, 827 F. App'x at 630;

13    *accord* Rubenstein Decl. ¶ 20 (observing that the Ninth Circuit has found the lodestar cross-

14    check to be "inapplicable or unhelpful in certain specific situations" and identifying this case as

15    one such situation). Courts in this district, including this Court, routinely do just that. *See, e.g, In*

16    *re HQ Sustainable Mar. Indus., Inc. Derivative Litig.*, No. C11-910 RSL, 2013 WL 5421626, at

17    *3 (W.D. Wash. Sept. 26, 2013) (Lasnik, J.) (closely scrutinizing the requested fee award but

18    declining to conduct a lodestar cross-check, awarding class counsel 32% of the benefits

19    conferred on the class in recognition of the complexity of the dispute, the expense of prosecuting

20    related actions, and the difficult of reaching a settlement with many participants); *Ikuseghan v.*

21    *Multicare Health Sys.*, No. C14-5539 BHS, 2016 WL 4363198, at *2 (W.D. Wash. Aug. 16,

22    2016) (Settle, J.) (collecting cases, awarding 33% of the fund and declining to conduct a lodestar

23    cross-check).

24    As Professor Rubenstein explains, at least three unique circumstances specific to these

25    cases render a cross-check unhelpful here:

26

27

- *First*, this settlement does not stand alone but is one of a group of current (and possibly future) settlements and/or judgments Class Counsel will achieve against social casinos. In this multiple case situation, it is often difficult to attribute lodestar to any one specific case, rendering application of a lodestar cross-check problematic . . . .

- *Second*, Class Counsel's work in the social casino space not only encompasses a number of settlements, it also encompasses a number of unsuccessful matters. Contingent fee lawyers do not get paid for losing cases. But the question presented by the lodestar cross-check is not whether to *pay* class counsel, but what hours of work to recognize in checking the level of counsel's proposed fees in the cases that reach a settlement or judgment for the class … At the least, it is fair to acknowledge that the fact that a conventional cross-check might not account for these hours renders such a cross-check less than optimal on facts such as these . . . .

- *Third*, this case does not involve solely litigation activities. Class Counsel were forced to work on behalf of the class in multiple forums, including legislative arenas and executive branch administrative proceedings, and across various states. Courts have not hesitated to award fees for such activities in appropriate circumstances, but including hours and rates for non-litigation work in a litigation-related lodestar cross-check risks an uncomfortable level of imprecision even within that back-of-the-envelope endeavor.

*See* Rubenstein Dec. ¶ 21.

More broadly, Professor Silver argues lodestar cross-checks are undesirable for a variety of reasons: they have been uniformly rejected by the private market; they "penalize efficiency and reward delay"; and at bottom they weaken the alignment of incentives between client and counsel (with the effect of discouraging lawyers from taking risks that class members would rationally want them to accept). *See* Silver Decl. ¶ 75-78. Myriad class action scholars echo Professor Silver's criticism of lodestar cross-checks. Professors Myriam Gilles and Gary B. Friedman, for example, argue that using the lodestar cross-check effectively blunts the incentives for class counsel to achieve the largest possible award for the class, in turn reducing the deterrence effect of class action. *See* Myriam Gilles & Gary B. Friedman, *Exploding the Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers*, 155 U. PA. L. REV. 103, 150-55 (2006). Similarly, Professor Brian T. Fitzpatrick argues that a lodestar cross-check is simply a way to "sneak the lodestar method in the backdoor," which "sends a bad message to

1   future class action lawyers: don't resolve cases too quickly; drag them out to beef up your

2   lodestar so your fee percentage isn't cut." Brian T. Fitzpatrick, *The Conservative Case for Class*

3   *Actions*, University of Chicago Press, Oct 30, 2019.

4          Consider, for example, *In re Volkswagen "Clean Diesel" Marketing Sales Practices, &*

5   *Products Liability Litigation*, No.15-md-2672 CRB (JSC), 2017 WL 1047834 (N.D. Cal. Mar.

6   17, 2017), which was filed eight months after this case. In *Volkswagen*, almost no adversarial

7   litigation took place. The court expressly noted that "Volkswagen's liability [was] not contested"

8   and commented on "the short time frame it took the parties to settle the … class action claims."

9   *Id.* at *2. The Parties reached a settlement by July 2016 (the same month that, in this case,

10  Churchill Downs submitted its answering brief to the Ninth Circuit) which Judge Breyer

11  approved in March 2017 (while the Parties here were exchanging supplemental submissions to

12  the Ninth Circuit). *Id.* at *1. Nevertheless, class counsel in *Volkswagen* managed to expend

13  approximately 98,000 hours litigating and settling the case, arriving at a lodestar of $63.5

14  million. *Id.* at *5. The court found the hours and lodestar reasonable and determined that "there

15  is no indication that Class Counsel sought to artificially inflate their hours to justify the lodestar

16  amount." *Id.*

17         In this litigation—where nearly *everything* was contested, all the way down to motion

18  practice over the entry of an ESI protocol—Class Counsel have long known they could, like the

19  attorneys in *Volkswagen*, expend an almost unlimited number of billable hours. Yet, consistent

20  with their principled approach to all cases they handle, Class Counsel staffed these cases leanly

21  and worked efficiently. *See* Logan Decl. ¶ 29. Briefs were not drafted by committee, but instead

22  assigned to a single attorney who took charge of drafting the arguments, soliciting feedback, and

23  revising accordingly. *See id.* ¶ 30. Class Counsel declined to conduct a parade of minimally-

24  useful third-party depositions (or, moreover to treat such depositions as conventions). *See id.* ¶

25  31. Care was taken to avoid unnecessary duplication of document review. *See id.* ¶ 32. Where

26  appropriate, primary responsibility for tasks was assigned to more junior attorneys, with partners

27  acting in a supervisory capacity. *See id.* ¶ 33. For example, almost all major briefing, including

the lion's share of the briefing before the Ninth Circuit, both of Defendants' motions to dismiss, each of Defendants' motions to compel arbitration, the Parties' dueling discovery briefs, and the motion to compel production from, was drafted by associate-level attorneys, not senior partners. *See id.* ¶ 34. And every oral argument conducted—including argument before the Ninth Circuit—was made by an associate. *See id.* ¶ 35.

That is not to say having fewer lawyers on the case slowed down Class Counsel. Class Counsel repeatedly opposed Defendants' efforts to stay or otherwise slow down this litigation. Nor is the point that Edelson's senior partners did not closely manage this case—they of course did. The point is that Class Counsel has worked diligently on this case, has not overstaffed it, and has not performed unnecessary tasks in an effort to pad its lodestar. Consequently, relying on a lodestar cross-check here would effectively penalize Class Counsel's choices and incentivize attorneys in similar situations in the future to delay and overstaff cases for the purpose of manufacturing thousands of unnecessary, additional hours for the sole purpose of inflating lodestars. The Court should not create those incentives with its fee decision in this case.

## II.   Class Counsel's Reasonably-Incurred Expenses Should Be Reimbursed.

In common-fund cases, the Ninth Circuit has stated that the reasonable expenses of acquiring the fund can be reimbursed to counsel who has incurred the expense. *See Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977); *Acosta v. Frito-Lay, Inc.*, No. 15-CV-02128-JSC, 2018 WL 646691, at *11 (N.D. Cal. Jan. 31, 2018) ("There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund.") (citation omitted). Expense awards comport with the notion that the district court may "spread the costs of the litigation among the recipients of the common benefit." *Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1121 (9th Cir. 2002).

Here, Class Counsel reasonably incurred and request reimbursement for **$1,785,942.27** in

**Edelson PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

litigation expenses and costs.[4] Logan Decl. ¶ 36. The lion's share of these expenses reflects the

fact that Class Counsel has been required to pay for the entire Court-approved settlement notice

program, to the tune of $1,549,031 (*i.e.*, approximately 1% of the Settlement Fund) out of their

own pocket. *Id.* ¶ 37. Class Counsel has already advanced $954,118.00 of those costs

(constituting the costs of all media and postage associated with the notice program), and will be

paying the remaining $594,913.00 as that portion becomes due and owing over the coming

months. *Id.* The next most significant line-item is $110,827 in lobbying fees Class Counsel paid

their lobbyists who assisted Class Counsel's efforts opposing various efforts to change

Washington Gambling laws. *Id.* ¶ 38. Next up, at $84,425.27, is the costs of Class Counsel's

internet advertising expenses related to identifying and engaging with Class Members and

conducting the website-based "opt-out" campaign that began in January 2020. *Id.* ¶ 39. Class

Counsel also paid Phillips ADR $17,500 in connection with the mediation that ultimately led to a

settlement in this case. *Id.* ¶ 40. The remaining $24,159 in expenses are the sorts of routine

litigation expenses incurred over five years of litigating a complex class action lawsuit: court

filing fees, work-related transportation, lodging, and meal costs, and postage fees. *Id.* ¶ 41. These

sorts of expenses are in line with those routinely approved in this District and affirmed by the

Ninth Circuit. *See, e.g.*, *Dennings v. Clearwire Corp.*, No. C10-1859-JLR, 2013 WL 1858797, at

\*10 (W.D. Wash. May 3, 2013), *aff'd* (Sept. 9, 2013).

### III. The Court Should Give Cheryl Kater And Manasa Thimmegowda Incentive Awards Of $10,000 Each, And Should Give Suzie Kelly An Incentive Award Of $50,000.

The Court should also issue incentive awards to the Class Representatives in recognition

of their service to the Class. "Incentive awards are fairly typical in class action cases [to] . . .

compensate class representatives for work done on behalf of the class, to make up for financial

---

[4]     Class Counsel possess invoices, receipts, and/or other documentary evidence of all such expenses, and stand ready to submit them for the Court's review, preferably *in camera*, should the Court choose to review them. Logan Decl. ¶ 37.

1  or reputational risk undertaken in bringing the action, and, sometimes, to recognize their

2  willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948,

3  958-59 (9th Cir. 2009). To determine the appropriate amount of an award, courts consider "the

4  actions the plaintiff has taken to protect the interests of the class, the degree to which the class

5  has benefitted from those actions, [and] the amount of time and effort the plaintiff expended in

6  pursuing the litigation." *Bell v. Consumer Cellular, Inc.*, No. 15-cv-941, 2017 WL 2672073, at

7  *8 (D. Or. June 21, 2017).

8       The Court should award Ms. Kater and Ms. Thimmegowda $10,000 incentive awards. As

9  detailed more fully in their declarations, both Kater and Thimmegowda invested dozens of hours

10 of their time making substantial contributions to the Class, including staying in regular

11 communication with Class Counsel, reviewing and approving pleadings and other papers,

12 responding to written discovery, and closely reviewing the Settlement Agreement before

13 approving it. and participating in the settlement process. *See* Declaration of Cheryl Kater ("Kater

14 Decl.") ¶ 5; Declaration of Manasa Thimmegowda ("Thimmegowda Decl.") ¶ 5. All of that time

15 could have instead been spent working or being with friends or family. *See* Kater Decl. ¶ 6;

16 Thimmegowda Decl. ¶ 6. And each has made substantial personal sacrifices for the benefit of the

17 Class, including the fact that anyone who Googles their name now sees pages and pages of

18 websites talking about their involvement in this lawsuit. *See* Kater Decl. ¶ 4; Thimmegowda

19 Decl. ¶ 4. For these efforts and sacrifices, the Court should issue each a reasonable $10,000

20 incentive award. *See McClintic v. Lithia Motors, Inc.*, No. C11-859RAJ, 2011 WL 13127844, at

21 *6 (W.D. Wash. Oct. 19, 2011) ($10,000 incentive award reasonable in $1.74 million

22 settlement); *Chehalem Physical Therapy v. Coventry Health Care, Inc.*, No. 09-cv-00320-HU,

23 2014 WL 4373150, at *4 (D. Or. Sept. 3, 2014) ($10,000 incentive awards reasonable).

24       The Court should also award Ms. Kelly a $50,000 incentive award.[5] Ms. Kelly's service

25

26  [5]       To be clear, Ms. Kelly, Ms. Kater, and Ms. Thimmegowda have not been guaranteed any incentive awards,
understand that any incentive awards are entirely discretionary, and that the Court may approve of the Settlement

27  but deny any incentive awards. Kelly Decl. ¶ 2; Kater Decl. ¶ 2; Thimmegowda Decl. ¶ 2.

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

1    to and sacrifice for the Class is—like this settlement—without precedent. Over the years, Class

2    Counsel has spoken with dozens of consumers with six-figure losses to social casino games.

3    Logan Decl. ¶ 42. Of that group, Suzie Kelly is the only qualified individual who was willing to

4    step forward in this case by sharing her story and serving as a Class Representative. *Id.* ¶ 43. And

5    Ms. Kelly did not just share her story with the lawyers and the Court; she told it to the entire

6    nation. *See, e.g.*, *How social casinos leverage Facebook user data to target vulnerable gamblers*,

7    PBS NEWSHOUR (Aug. 13, 2019), *available at* https://to.pbs.org/3lPRd1m (television interview

8    broadcasted nationwide). As Ms. Kelly explains in her partially-redacted declaration, her

9    decision to share her story with the world—replete with details of her addiction and its

10   staggering real-world toll—continues to be a devastating source of hardship in her personal life.

11   *See* Declaration of Suzie Kelly ("Kelly Decl.") ¶ 7-23.

12          Yet if Ms. Kelly never had stepped forward to shoulder that burden, it is extremely

13   unlikely—at least in Class Counsel's view—that the Class would have ultimately obtained the

14   $155 million settlement that is now before the Court. *See* Logan Decl. ¶ 44. In other words, Ms.

15   Kelly's enormous personal sacrifice paved the road for the Class to recover more than one

16   hundred and fifty million dollars. In that context, the Court should not hesitate to award Ms.

17   Kelly an incentive award of $50,000. While that is certainly a substantial incentive award for a

18   consumer case, extraordinary efforts and results justify an award of $50,000. *See, e.g.*, *Van*

19   *Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299-300 (N.D. Cal. 1995) (awarding $50,000 on

20   a judgment of $67 million); *del Toro Lopez v. Uber Techs., Inc.*, No. 17-cv-6255, 2018 WL

21   5982506, at *3 (N.D. Cal. Nov. 14, 2018) (awarding $50,000 and $30,000 to class

22   representatives on a $10 million recovery); *Pan v. Qualcomm Inc.*, No. 16-cv-1885, 2017 WL

23   3252212, at *13 (S.D. Cal. July 31, 2017) (awarding $50,000 to seven representatives on a $19.5

24   million recovery).

25          To be clear, based on the Settlement Administrator's projected claims rates, even a

26   $50,000 incentive award would—in view of Ms. Kelly's estimated $350,000 in losses—still not

27   make Ms. Kelly whole. *See* Logan Decl. ¶ 45. Moreover, a $50,000 incentive payment is not

1   disproportionate to the total recovery or to the recovery of individual class members. An award

2   "which amount[s] to just 0.4 percent of the total recovery," does not "create a conflict or

3   potential conflict between the Class Representatives and the Class." *In re High-Tech Emp.*

4   *Antitrust Litig.*, No. 11-cv-2509, 2014 WL 10520478, at *3 (N.D. Cal. May 16, 2014). Here, a

5   $50,000 award is substantially less than 1/10 of 1 percent of the $155 million judgment. And

6   based on the Plan of Allocation, many participating class members stand to receive recoveries of

7   hundreds of thousands of dollars.

8                                    **CONCLUSION**

9         Plaintiffs respectfully request that the Court approve Class Counsel's fee request of 25%

10  of the Settlement Fund, or $38,750,000; award Class Counsel costs and expenses in the amount

11  of $1,785,942.27; issue Cheryl Kater and Manasa Thimmegowda incentive awards of $10,000

12  each; and issue Suzie Kelly an incentive award of $50,000.

13

14                                   Respectfully submitted,

15  Dated: December 14, 2020         By: /s/ Alexander G. Tievsky

16
                                     Alexander G. Tievsky, WSBA #57125
17                                   atievsky@edelson.com
                                     EDELSON PC
18                                   350 N LaSalle Street, 14th Floor
                                     Chicago, IL 60654
19                                   Tel: 312.589.6370 / Fax: 312.589.6378

20

21                                   By: /s/ Todd Logan
22
                                     Rafey S. Balabanian*
23                                   rbalabanian@edelson.com
                                     Todd Logan*
24                                   tlogan@edelson.com
                                     Brandt Silver-Korn*
25                                   bsilverkorn@edelson.com
                                     Edelson PC
26                                   123 Townsend Street, Suite 100
27

1

San Francisco, California 94107
Tel: 415.212.9300/Fax: 415.373.9435

2

3

By: /s/ Cecily C. Shiel

4

TOUSLEY BRAIN STEPHENS PLLC
Cecily C. Shiel, WSBA #50061
cshiel@tousley.com
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600

5

6

7

8

*Plaintiffs' Attorneys and Class Counsel*
*Admitted pro hac vice*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378